874 A.2d 1084

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. OBED TORRES, A/K/A OVED TORRES, OVED FLORES, "HEATHCLIFF", DEFENDANT–APPELLANT.

Argued January 18, 2005—Decided June 16, 2005.

558

*Michael B. Jones,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Lora B. Glick,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

Justice WALLACE delivered the opinion of the Court.

This case presents an issue of first impression, whether an experienced police officer who specializes in street gang investigations should be permitted to give expert testimony on "gang" hierarchy, organization, and discipline. The trial court found the expert was qualified to testify and admitted the testimony. On appeal before the Appellate Division, defendant challenged the jury charge on accomplice liability and the use of expert testimony related to gangs. In an unpublished opinion, the Appellate Division affirmed. We granted defendant's petition for certification and now affirm. We conclude that the instruction on accomplice liability was appropriate, and if properly qualified, an expert may give gang-related testimony.

I.

The facts developed at trial revealed that defendant Obed Torres was a leading member of a Latino gang known as "MS–13." Defendant's gang nickname was "Heathcliff." Defendant and another MS–13 member nicknamed "Little Vato" were two of the gang's "bosses." On the night of October 25, 1997, defendant attended a MS–13 meeting in Jersey City.

Just before the meeting, Walter Gomez, nicknamed "Camello," and Alberto Arroyo, nicknamed "Urraca," had an altercation in a restaurant. The argument, which began when Camello ridiculed Urraca's tattoo, escalated to Urraca pushing Camello and Camello throwing a bottle at Urraca. Camello previously had been a leader of the gang, but had fallen from power.

When defendant arrived at the gang meeting, he was informed of the altercation between Camello and Urraca. Both men were present at the meeting and continued to display hostility towards each other. Camello was asked to leave, but he protested. Eventually, Camello left claiming he was going home to get his machete. Urraca then asked for and received a knife from defendant. Before the meeting concluded, Urraca told defendant that Camello would have to die.

After the meeting, defendant met with several other people at a nearby restaurant. The group included Urraca, several women, and three other gang members, nicknamed "Sleepy," "Smokey," and "Ricardo." They decided to look for Camello and invite him to Lincoln Park to drink some beer and "party." After they located him in a nearby bar, Camello agreed to join them so long as they had some marijuana to smoke. They did not, so Camello and one of the women left the group to buy some marijuana.

The two were unable to find marijuana, so Camello went to the park. The woman who left with Camello returned to the others and said that Camello was waiting for them at the entrance of the park. They then met Camello and entered the park to drink some beer. Sometime later, all of the women departed, leaving defendant, Camello, Ricardo, Sleepy, Smokey, and Urraca in the park.

As the gang members continued to walk around, they reached a pedestrian bridge that crossed over Routes 1 and 9. Camello sat on the bridge and dangled his legs over the side before defendant persuaded him to get off the bridge. Defendant then walked off the main path to relieve himself. Urraca approached defendant and said he intended to kill Camello. Defendant did not respond, but engaged Smokey in conversation.

While Urraca, Sleepy, and Camello were standing together, Sleepy suddenly attacked Camello with a machete, striking him about the head and neck. Camello fell to the ground as Sleepy continued to slash at him. Urraca joined in and stabbed Camello with a knife several times in the lower back. Sleepy and Urraca then approached defendant and told him "it was done." Defen-

dant instructed the gang members to leave the park. As defendant and Ricardo jumped over a fence to cross the highway, they encountered two Hudson County Sheriff's officers who had been alerted about a group of people in the park. Sleepy and Urraca continued to run away, but defendant and Ricardo stopped. Defendant told the officers they had been drinking in the park and gave them his name and address. The officers called headquarters to ascertain if there were any outstanding warrants on the two men. Upon learning that there were none, they released both individuals.

The next day Camello's body was discovered in the park. Because the police had defendant's name and address from the encounter in the park, they sought to question him. That night, police went to defendant's home and defendant signed a consent to search form. The police seized several items identifying defendant with the MS–13 gang. Defendant agreed to waive his *Miranda*[1] rights and thereafter gave a statement outlining his version of the killing of Camello that implicated other MS–13 gang members but not himself. Defendant was placed under arrest and subsequently, Sleepy and Urraca were arrested.

Defendant and codefendants, Sleepy and Urraca, were indicted for first-degree murder, *N.J.S.A.* 2C:11–3(a)(1) or (2) (count one); two counts of fourth-degree unlawful possession of a weapon, *N.J.S.A.* 2C:39–5(b) (counts two and three); and third-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4(d) (count four).

At trial, the State presented the testimony of former MS–13 member Luis Galdamez. Galdamez described the gang meeting on the night of the murder and explained that a "heat-up" order was issued against Camello. That meant that any member of the gang could harm Camello and not be subject to reprisal from MS–13 leadership. Galdamez also testified that defendant was one of

---

[1] *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

two MS–13 leaders that night. He did not testify that defendant was responsible for Camello's heat-up order.

The State then indicated it intended to offer Investigator Timoteo Vazquez as an expert witness. Prior to receiving his testimony, the trial court conducted a hearing to determine whether the State would be permitted to present Vazquez as an expert witness on Hispanic street gangs. Vazquez explained that he worked for the New Jersey Division of Criminal Justice, Attorney General's Office, and was part of the Organized Crime Bureau, Nontraditional Organized Crime Unit. He had been in law enforcement for twenty years and had worked four years in the State Police Street Gang Unit as an investigator, instructor, and lecturer on gang activities. During that period, he interviewed approximately ten to fifteen members of the MS–13 gang. The prosecutor sought to have Vazquez testify to the operation and hierarchy of Hispanic street gangs in general, and the MS–13 gang in particular. Defense counsel objected, urging that Vazquez's testimony would not be expert testimony but rather it would be fact testimony based on hearsay.

The trial court determined that the State could offer Vazquez as an expert because his specialized training and experience would assist the jurors. The court, however, limited his testimony to the general operation and hierarchy of Hispanic street gangs and specifically with regard to MS–13 gangs. The trial court then informed the jury that Vazquez would give expert testimony, and that the jury should consider his testimony, giving it whatever "weight to which you deem it's entitled."

During direct examination, Vazquez testified concerning the history of MS–13 gangs, and where they were located. He stated that the gangs are organized on a local level by an individual who is placed in charge from some other location and then voted upon. That individual would in turn recruit other members and appoint one or two subordinate leaders. Vazquez explained that gang members commonly use nicknames and wear MS–13 tattoos as a symbol of pride and identification with the gang. He stated that

discipline is strictly enforced and that if the leader decides that a member has committed some type of violation, the punishment could range from a simple beating to death.

On cross-examination, defense counsel asked Vazquez about the tattoos and the way the gang determines punishment. Defense counsel attempted to question Vazquez about discrepancies in his report in the present case, but the prosecutor objected to specific testimony about the MS-13 gang. The trial court sustained the objection. After being asked to describe how one MS-13 member would be permitted to harm another, Vazquez replied that the only way one member could hurt another member would be to have approval from the governing body; otherwise that member risks having action taken against him by the gang.

The State also offered defendant's statement in evidence. In his statement, defendant asserted that Sleepy and Urraca killed Camello. Defendant did not testify and presented no witnesses on his behalf. The jury found him guilty of all charges, and the court sentenced him to thirty years imprisonment with thirty years of parole ineligibility on count one and, after merging counts two and three into count four, imposed a concurrent four-year term on count four.

On appeal, the Appellate Division affirmed, rejecting defendant's contentions of error in the charge on accomplice liability and in the ruling to permit Vazquez to testify as an expert on gang behavior. The panel found that the trial court's instruction on accomplice liability mirrored the Model Jury Charge and correctly instructed the jury on the mental state required to find accomplice liability. Further, the panel found no abuse of discretion in allowing Vazquez to testify as an expert in gang behavior, observing that the "interviews upon which he based his knowledge of the subject are the kind of sources ordinarily utilized by experts in sociological studies." We granted defendant's petition for certification. *State v. Torres*, 181 *N.J.* 286, 854 *A.*2d 920 (2004).

## II.

■ Just as he did before the Appellate Division, defendant suggests error in the instruction on accomplice liability. Because defendant failed to object to the instruction at trial and raised it for the first time on appeal, we consider this issue under the plain error rule. *R.* 2:10–2. Our rules provide that a defendant waives the right to contest an instruction on appeal if he does not object to the instruction. *R.* 1:7–2. We may reverse on the basis of unchallenged error if we find error that was "clearly capable of producing an unjust result." *R.* 2:10–2.

■ Plain error in the context of a jury charge is "[I]legal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." *State v. Jordan,* 147 *N.J.* 409, 422, 688 *A.*2d 97 (1997) (citations omitted). The charge must be read as a whole in determining whether there was any error. *Ibid.* (citing *State v. Wilbely,* 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973)). Even so, if the error is in a jury instruction that is "crucial to the jury's deliberations on the guilt of a criminal defendant[,]" it is a " 'poor candidate[ ] for rehabilitation' under the plain error theory." *Ibid.* (citation omitted).

The State sought to prove defendant's guilt as an accomplice by demonstrating that he was a leader of the MS–13 gang and ordered the execution of the victim. At the conclusion of the trial, the court provided the jury with a detailed instruction on accomplice liability that essentially mirrored the Model Jury Charge. *See New Jersey Supreme Court Committee on Model Jury Charges, Criminal, Model Jury Charges Liability for Another's Conduct, Accomplice, N.J.S.A.* 2C:2–6. With regard to the mental state required for accomplice liability, the trial court instructed:

A person is an accomplice of another person in the commission of an offense if with the purpose of promoting or facilitating the commission of the offense, he

either solicits such other person to commit it and/or aids or agrees or attempts to aid such other person in planning or committing it.

. . . .

Anyway, the State alleges that the defendant is equally guilty of the crimes committed by Sleepy and/or Urraca because he acted as their accomplice with the purpose that the specific crimes charged be committed. In order to find the defendant guilty of the specific crimes charged, murder and the weapons offenses, the State must prove beyond a reasonable doubt each of the following elements:

First, that one or both of the other two committed the crimes of murder and the weapons offenses that I'm going to explain to you what the elements of both offenses are in a little bit;

That this defendant, meaning Mr. Torres, solicited the others to commit those crimes and/or aided or agreed to aid or attempted to aid them in planning and committing them—or committing them;

That Mr. Torres's purpose was to promote or facilitate the commission of the offenses;

That this defendant, Mr. Torres, possessed the criminal state of mind that is required to be proved against the person who actually committed the criminal act.

Remember that one acts purposely with respect to his conduct or a result of his conduct if it's his conscious object to engage in conduct of that nature or to cause such a result.

So you have to act with the—a defendant, to be an accomplice, would have to act purposely to promote or facilitate the commission of the offense. It would have to be his conscious object to promote or facilitate the commission of the offenses, and he would have to act with the same state of mind as the people who were the principals, who actually did the offenses.

So if you were—if something required that someone acted purposely or knowingly, the defendant would have to be found to have acted purposely or knowingly in order to be an accomplice. But every act he takes, if you were to find there were acts taken to commit those crimes, it would have to be with the purpose of committing those crimes.

[ (emphasis added).]

Elsewhere in the instructions, the trial court directed the jury that

[i]n order for you to find the defendant guilty of murder, the State must first establish beyond a reasonable doubt that the defendant caused [the victim's] death or serious bodily injury resulting in death, either purposely or knowingly, as I have defined those terms for you.

. . . .

And if you're satisfied beyond a reasonable doubt that [the victim] was stabbed and killed with a knife and machete, you may draw an inference from the weapons used and from the manner and circumstances of the killing as to the purpose of the

principals in using those weapons and then whether or not the defendant shared that purpose as an accomplice, that purpose and knowledge.

Now, all jurors do not have to agree unanimously concerning which form of murder is present, in other words, whether it's purposeful or knowing, so long as all believe that it was one form of murder or the other. However, for a defendant to be guilty of murder, all jurors must agree that the defendant either knowingly or purposely was an accomplice to those who caused the death or serious bodily injury resulting in death of [the victim].

"A defendant is guilty as an accomplice when '[w]ith the purpose of promoting or facilitating the commission of the offense[,] he ... [a]ids or agrees or attempts to aid such other person in planning or committing it.'" *State v. Norman*, 151 *N.J.* 5, 31–32, 697 *A.*2d 511 (1997) (quoting *N.J.S.A.* 2C:2–6). "'[F]or accomplice liability to attach the defendant must have a purpose that someone else engage in the conduct which constitutes the particular crime charged.'" *Id.* at 32, 697 *A.*2d 511 (citation omitted). Therefore, for a defendant to be guilty as an accomplice, he or she must (a) possess the culpability required for the substantive crime, and (b) actually foresee and intend the result of his or her act. *Ibid.* (citation omitted).

Pursuant to the murder statute, the State was required to prove that defendant purposefully or knowingly intended the killing. *N.J.S.A.* 2C:11–3(a)(1)–(2). As an accomplice to murder, the State had to convince the jury that defendant shared the purpose of causing "death or serious bodily injury resulting in death, either purposely or knowingly." The trial court sufficiently enunciated those elements to the jury. Accordingly, we find no error in the charge on accomplice liability that was capable of producing an unjust result.

### III.

We now turn to defendant's principal contention that the gang-related expert testimony given by Investigator Vazquez should have been excluded. Although we have not previously addressed this issue, many other jurisdictions have.

 Preliminarily, we note that the admission or exclusion of evidence is within the discretion of the trial court. Prior to the admission of expert testimony, the trial court should conduct a hearing under *New Jersey Rule of Evidence* 104 (*Rule* 104) concerning the admissibility of the proposed expert testimony. *State v. Harvey*, 151 *N.J.* 117, 167, 699 *A.*2d 596 (1997), *cert. denied*, 528 *U.S.* 1085, 120 *S.Ct.* 811, 145 *L.Ed.*2d 683 (2000). The party offering the evidence has the burden of proof to establish its admissibility. *Ibid.* (citation omitted). In a *Rule* 104 hearing, which is conducted outside the presence of a jury, the party offering the proposed expert should elicit the qualifications of the expert and the specific content of the proffered testimony. After cross-examination by the opposing party, the court should render a decision on the admissibility of the proffered testimony. Additionally, the *Rule* 104 hearing is a favored means to create a record for appellate review of a disputed decision.

 While the trial court is in a better position to shape the record and make credibility determinations, "appellate courts can digest expert testimony as well as review scientific literature, judicial decisions, and other authorities." *Ibid.* The appellate court should carefully review the relevant authorities in determining the correctness of the decision to admit or exclude the disputed testimony. *Ibid.* In short, the appellate court need not be as deferential to the trial court's ruling on the admissibility of expert scientific evidence as it should be with the admissibility of other forms of evidence. *Ibid.*

 The starting point for determining the admissibility of expert testimony is *New Jersey Rule of Evidence* 702. That rule provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Thus, the rule sets forth three basic requirements for the admission of expert testimony: " '(1) the intended testimony must

concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.'" *State v. Berry*, 140 *N.J.* 280, 290, 658 *A.2d* 702 (1995) (quoting *State v. Kelly*, 97 *N.J.* 178, 208, 478 *A.2d* 364 (1984)).

### A.

■ The first requirement for the admission of expert testimony addresses the concern that the evidence "relates to a relevant subject that is beyond the understanding of the average person of ordinary experience, education, and knowledge." *State v. Odom*, 116 *N.J.* 65, 71, 560 *A.2d* 1198 (1989). "If the expert's testimony on such a subject would help the jury understand the evidence presented and determine the facts," it satisfies the first requirement for admissibility. *Ibid.*

### B.

Next, the field of inquiry must be generally accepted such that an expert's testimony would be sufficiently reliable. In *Kelly, supra,* we explained how the reliability of a relatively new field of research may be established:

> There are generally three ways a proponent of expert testimony can prove its reliability in terms of its general acceptance within the professional community. First, such general acceptance can be established by the testimony of knowledgeable experts. Second, authoritative scientific literature can be used to establish professional acceptance. Finally, persuasive judicial decisions that acknowledge such general acceptance of expert testimony can be followed.
>
> [97 *N.J.* at 224, 478 *A.2d* 364 (citing *State v. Cavallo*, 88 *N.J.* 508, 521, 443 *A.2d* 1020 (1982)).]

The first two methods of proving the reliability of expert testimony do not apply here. There was neither evidence of general acceptance through the testimony of knowledgeable experts nor authoritative sociological literature to establish profes-

sional acceptance.[2]

The third method for demonstrating reliability, persuasive judicial decisions, is applicable here. Although we have no reported decision in New Jersey that addresses the specific question of whether expert testimony explaining the operations of gangs should be admissible, many out-of-state cases have considered the issue and have admitted the evidence. Those jurisdictions have concluded that interviews of former gang members are a permissible factual source for the formation of expert testimony and opinion, even though some of the information may be suspect. *See, e.g., Jordan v. State,* 629 *So.*2d 738, 740–42 (Ala.Crim.App. 1993) (holding expert's testimony on gang practices relevant to show defendant's motive for committing charged crimes was to ascend in rank within gang), *cert. denied,* 511 *U.S.* 1112, 114 *S.Ct.* 2112, 128 *L.Ed.*2d 671 (1994); *State v. Fierro,* 124 *Ariz.* 182, 603 *P.*2d 74, 79 (1979) (noting gang expert testimony regarding existence, purpose and behavior of Mexican Mafia highly probative on issue of defendant's possible motive for murder); *Jackson v. State,* —— *S.W.*3d ——, 2004 *WL* 2476455 at *3 (Ark. Nov.4, 2004) (noting expert testimony on membership, organization, purposes, and conduct of particular street gangs may be admissible); *People v. Gardeley,* 14 *Cal.*4th 605, 59 *Cal.Rptr.*2d 356, 927 *P.*2d 713, 720– 22 (1996) (holding gang expert's testimony admissible to explain assaults were gang-related activity and that Family Crip gang fit definition of "criminal street gang" under STEP Act), *cert. denied,* 522 *U.S.* 854, 118 *S.Ct.* 148, 139 *L.Ed.*2d 94 (1997); *People v. Olguin,* 31 *Cal.App.*4th 1355, 37 *Cal.Rptr.*2d 596, 601 (1995) (noting expert testimony on gang activity and affiliation admissible to show motive), *rehearing denied, review denied* (1995); *State v. Crocker,* 83 *Conn.App.* 615, 852 *A.*2d 762, 779–80 (upholding

---

[2] Although there are some law review articles regarding gang expert testimony, that source is limited. *See* Susan L. Burrell, *Gang Evidence: Issues for Criminal Defense,* 30 *Santa Clara L.Rev.* 739 (1990); Placido G. Gomez, *It Is Not So Simply Because an Expert Says It Is So: The Reliability of Gang Expert Testimony Regarding Membership in Criminal Street Gangs: Pushing the Limits of Texas Rule of Evidence 702,* 34 *St. Mary's L.J.* 581 (2003).

court's qualification of gang expert and admissibility of testimony on street gang behavioral codes), *certif. denied,* 271 *Conn.* 910, 859 *A.*2d 571 (2004); *Edge v. State,* 275 *Ga.* 311, 567 *S.E.*2d 1, 3 (2002) (finding expert testimony on gang culture including punishment meted out to gang members was beyond ken of average juror); *People v. Davis,* 335 *Ill.App.*3d 1, 268 *Ill.Dec.* 829, 779 *N.E.*2d 443, 455–58 (2002) (holding gang expert properly qualified and testimony on gang lifestyle admissible to establish motive), *appeal denied,* 202 *Ill.*2d 680, 272 *Ill.Dec.* 361, 787 *N.E.*2d 176 (2003); *State v. Jamison,* 269 *Kan.* 564, 7 *P.*3d 1204, 1209 (2000) (holding gang expert's testimony admissible to show motive and identity of defendant as shooter); *State v. Williams,* 833 *So.*2d 497, 508 (La.Ct.App.2002) (finding expert's testimony regarding gang culture, signs and language relevant to show defendant's motive related to gang rivalry), *writ denied,* 842 *So.*2d 398 (La.2003); *Commonwealth v. Swafford,* 441 *Mass.* 329, 805 *N.E.*2d 931, 934–35 (2004) (finding evidence of gang affiliation admissible to show motive or joint venture and expert properly qualified because testimony on gang affiliation relevant to show motive for shooting); *State v. Her,* 668 *N.W.*2d 924, 927–28 (Minn.Ct.App.2003) (finding gang expert testimony admissible to corroborate testimony of defendant's accomplice); *State v. Seddens,* 878 *S.W.*2d 89, 92–93 (Mo.Ct.App.1994) (noting gang expert properly qualified and testimony helpful to jury to establish motive for shooting was gang rivalry); *State v. Nieto,* 129 *N.M.* 688, 12 *P.*3d 442, 450 (2000) (noting expert testimony on gang subculture relevant to show defendant's motive for killing was ascension in rank within gang); *Utz v. Commonwealth,* 28 *Va.App.* 411, 505 *S.E.*2d 380, 386–88 (1998) (noting gang expert properly qualified and testimony relevant to establish defendant's motive for shooting victim and to refute self-defense); *State v. Campbell,* 78 *Wash.App.* 813, 901 *P.*2d 1050, 1056 (noting expert testimony on gang behavior was admissible to show motive), *review denied,* 128 *Wash.*2d 1004, 907 *P.*2d 296 (1995); *State v. Long,* 255 *Wis.*2d 729, 647 *N.W.*2d 884, 888–91 (App.) (noting gang expert properly qualified and testimony on gang culture and affiliation relevant to show possible bias of

witnesses in shaping testimony), *review denied,* 257 *Wis.*2d 117, 653 *N.W.*2d 889 (2002).

A number of federal court decisions also favor the admissibility of gang related expert testimony. *See, e.g., United States v. Mansoori,* 304 *F.*3d 635, 652–54 (7th Cir.2002) (recognizing gang expert testimony regarding history, leadership and operations of particular gang helpful to jurors), *cert. denied,* 538 *U.S.* 967, 123 *S.Ct.* 1761, 155 *L.Ed.*2d 522 (2003); *United States v. Lemon,* 239 *F.*3d 968, 971 (8th Cir.2001) (admitting gang expert testimony on defendant's admitted gang membership); *United States v. Hankey,* 203 *F.*3d 1160, 1168–69 (9th Cir.)(noting gang expert testimony relevant and reliable based on expert's twenty-one years experience as police officer, including undercover gang work, formal training on structure and organization of gang, and teaching classes on gangs), *cert. denied,* 530 *U.S.* 1268, 120 *S.Ct.* 2733, 147 *L.Ed.*2d 995 (2000); *United States v. Robinson,* 978 *F.*2d 1554, 1563–64 (10th Cir.1992) (finding expert testimony on gang affiliation relevant to formation, agreement and purpose of drug conspiracy and assisted jury in explaining that clothing worn by defendants linked them to Crips gang), *cert. denied,* 507 *U.S.* 1034, 113 *S.Ct.* 1855, 123 *L.Ed.*2d 478, *cert. denied,* 508 *U.S.* 963, 113 *S.Ct.* 2938, 124 *L.Ed.*2d 687 (1993); *United States v. Myrick,* 1998 *WL* 832647 at *21 (N.D.Ill.1998) (finding gang expert testimony regarding defendants' street gang membership relevant to establish relationship and existence of conspiracy to distribute drugs).

Based on the substantial number of judicial decisions permitting expert testimony related to gang activity, we are convinced that the persuasive judicial decisions portion of the test for reliability of expert testimony has been met.[3]

---

[3] We observe that a number of state and federal courts have admitted gang expert testimony for the purpose of showing motive. Although we accept those cases as satisfying the test for reliability of gang expert testimony in the present case, we do not decide whether the expert testimony should be admissible to establish motive.

## C.

The final requirement for admissibility is that the expert is qualified by knowledge, skill, experience, training, or education. *State v. Moore*, 122 *N.J.* 420, 458–59, 585 *A.2d* 864 (1991). The expert may be qualified on the basis of his experience, even when it is limited. *Id.* at 457–60, 585 *A.2d* 864. In *Moore*, we held that a trooper with two years experience as a crime scene investigator, but only two days training in blood-spatter analysis, qualified as an expert. *Id.* at 460, 585 *A.2d* 864. The trial court has discretion in determining the sufficiency of the expert's qualifications "and [its decision] will be reviewed only for manifest error and injustice." *State v. Ravenell*, 43 *N.J.* 171, 182, 203 *A.2d* 13 (1964) (citations omitted), *cert. denied*, 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965).

## IV.

Against this legal background, we must determine whether the trial court's admission of Investigator Vazquez's testimony was proper. We conclude that it was.

The trial court, after hearing the evidence relating to Vazquez's background and experience, concluded that he had "personalized knowledge beyond what most of us have," and in light of "his work to study street gangs and Latino street gangs and MS–13 as part of that," he was qualified to present expert testimony on the organization and structure of such gangs. The court then informed the jury that Vazquez was "an expert in the field of Latin street gangs generally and specifically with regard to MS–13." The court further instructed, "this particular witness has specialized training and experience beyond that of the average juror, so that he can give testimony in the area of Hispanic–Latino street gangs." The court informed the jury that

[i]n the case of an expert witness, a witness can give testimony or information or opinion in matters in which he is versed. What we mean by an expert witness is a witness who has some special knowledge, experience, or training that's not possessed by the ordinary juror and thus may be able to assist the jury in performing its fact-finding functions.

I think having listened to the qualifications of this witness both as a teacher and pupil in the area of Latino gangs and his own experience through his job with the State, he does have some specialized knowledge, experience, and training that's not possessed by the ordinary juror in the area of Latino street gangs, so I'm going to permit him to testify.

## A.

Our review of the relevant case law from other jurisdictions satisfies us that the organization and structure of Latino street gangs, and the MS–13 gang in particular, are beyond the ken of the average juror. We are in accord with those jurisdictions that have concluded that testimony explaining the structure, organization, and procedures of street gangs would be helpful to a jury's understanding of the relevant issues at trial. That case law recognizes that jurors are unlikely to be familiar with the operations of street gangs and that expert testimony on the subject will be useful to jurors. Further, a gang expert's testimony must be restricted to those areas that fall outside the common knowledge of jurors. For example, a juror generally would not be expected to be familiar with the structure and organizational aspects of gangs or the significance of particular gang symbols. Those areas fall within the specialized knowledge of the expert, who by virtue of his training, experience, and skill can shed light on such subjects.

Here, the State sought to use expert testimony to explain defendant's role as the leader of the MS–13 gang. The testimony was offered to show defendant's actions as an alleged accomplice and co-conspirator in the murder of another MS–13 member. Vazquez's testimony concerning the operations and structure of the MS–13 gang was clearly beyond the ken of the average juror. It was relevant to show the connection between defendant's actions as the leader of the gang and the actions of the other gang members who actually committed the murder. Consequently, the State satisfied the first requirement by demonstrating that the testimony of the expert would assist the average juror in understanding the evidence.

## B.

At the time of the *Rule* 104 hearing, neither side referenced the second requirement that it was generally accepted that gang-related expert testimony was sufficiently reliable for admission into evidence. Before the Appellate Division and before us, the State offered numerous judicial opinions discussing the admissibility of gang-related expert testimony. *See supra* pp. 569–71, 874 *A.*2d at 1093–95. For example, in *Johninson v. State*, the Arkansas Supreme Court noted that

[d]uring the past few years, the nationwide proliferation of street gangs has captured the attention of the popular media, academic observers, and the legal system. The structures of urban gang life have been and are continuing to be explored in a growing body of work that embraces various disciplines. Studies of juvenile gang subcultures have contributed to the creation of specialized fields of sociological and criminological inquiry, which, through expert witnesses, are gaining some recognition in the nation's courts.

[878 *S.W.*2d 727, 730 (1994) (footnote omitted)].

Based on the numerous judicial decisions from other jurisdictions that have recognized the appropriateness of admitting certain gang-related expert testimony, we reach a similar result. We conclude that the expert gang-related evidence offered by Vazquez related to the hierarchy, organization, and discipline of the MS–13 gang was sufficiently reliable to satisfy the second requirement for its admissibility.

## C.

The final requirement for the admission of expert testimony is that the witness must be qualified by knowledge, skill, experience, training, or education in that area. The trial court found Vazquez qualified as an expert in the field of Latino gangs. The court noted that Vazquez had been in law enforcement for twenty years and had worked as an investigator for the New Jersey Division of Criminal Justice assigned to the Organized Crime Bureau, Crime Unit since 1996. His duties included tracking and assessing new gang trends, instructing and lecturing on gang alliance and suppression techniques, and handling investigations primarily for

Hispanic groups and organizations involved in combating street gangs. The trial court noted that Vazquez had interviewed approximately ten to fifteen members of the MS–13 gang. Those interviewed included arrestees, informants, and cooperating witnesses. During those discussions, Vazquez learned of gang protocols and modes of operation, the number of members, the person or persons in charge, where they operated, various crimes committed, and the initiation practices and behavioral codes within the organization.

Vazquez also attended approximately ten classroom sessions of specialized training as a student in the field of street gang culture, hierarchy, organization, and activities. Those sessions included specific instruction on the MS–13 gang. He estimated that he received between forty and eighty hours of instruction solely on MS–13 gangs and that the instruction was provided by individuals from different parts of the nation who had investigated crimes involving MS–13 members within different jurisdictions. Further, Vazquez had been certified as an instructor on street gang-related activities by the State Police Training Commission and had lectured approximately 100 times at various law enforcement seminars, although he had only approximately seven and one-half hours of credited classroom training regarding MS–13. Based on that testimony, the trial court found Investigator Vazquez qualified to give expert testimony related to gang activity.

As he did at trial, defendant challenges the qualifications of Vazquez as an expert because a portion of his testimony was based on inadmissible hearsay from interviews with other gang members. This argument in turn implicates *New Jersey Rule of Evidence* 703, which states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Yet, the expert's opinion should not provide "an independent basis for the admission of otherwise inadmissible hearsay." Biunno,

*Current N.J. Rules of Evidence,* comment 7 on *N.J.R.E.* 703 (2003); *see also State v. Burris,* 298 *N.J.Super.* 505, 512, 689 *A.*2d 860 (App.Div.) ("It would be a grave injustice in [a case where defendant elects to remain silent] to permit an expert witness to parrot the defendant's declaration, thus affording the accused an opportunity to testify without being subjected to cross-examination"), *certif. denied,* 152 *N.J.* 187, 704 *A.*2d 17 (1997).

 Although the out-of-court statements upon which expert witnesses rely may be characterized as hearsay, our rules of evidence permit an expert to rely on hearsay if that hearsay is of the type "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *N.J.R.E.* 703. Our appellate courts have recognized that "hearsay statements upon which an expert relies are admissible, not for [the purpose of] establishing the truth of their contents, but to apprise the jury of the basis of the opinion reached." *State v. Humanik,* 199 *N.J.Super.* 283, 305, 489 *A.*2d 691 (App.Div.) (citations omitted), *certif. denied,* 101 *N.J.* 266, 501 *A.*2d 934 (1985), *habeas corpus conditionally granted,* 871 *F.*2d 432 (3rd Cir.), *cert. denied,* 493 *U.S.* 812, 110 *S.Ct.* 57, 107 *L.Ed.*2d 25 (1989). Stated another way, an expert may offer out-of-court statements of others to support the opinions presented. *State v. Pasterick,* 285 *N.J.Super.* 607, 620, 667 *A.*2d 1103 (App.Div.1995) (noting that "expert who relies on hearsay as the basis of his opinion may relate that hearsay as part of his direct testimony"). Of course, the hearsay must be of the type usually relied on by experts in the field to reach "conclusions of the type offered by the witness." *Id.* at 620–21, 667 *A.*2d 1103 (citations omitted).

Other jurisdictions have generally acknowledged that the nature of obtaining information and experience in the present and related fields may necessarily depend upon hearsay evidence. In *United States v. Locascio,* the defendants urged that the expert's testimony violated *Federal Rule of Evidence* 703 and the Confrontation Clause of the Sixth Amendment because the expert "relied upon 'countless nameless informers and countless tapes not in evi-

dence....'" 6 *F*.3d 924, 937–38 (2d Cir.1993), *cert. denied,* 511
*U.S.* 1070, 114 *S.Ct.* 1646, 128 *L.Ed.*2d 365 (1994). The trial court
found that the expert was qualified to testify, and the expert
testified concerning the hierarchy of the particular organized
crime families and identified voices in taped conversations. *Ibid.*
The Second Circuit concluded that "expert witnesses can testify to
opinions based on hearsay or other inadmissible evidence if ex-
perts in the field reasonably rely on such evidence in forming their
opinions" and that "law enforcement agents routinely and reason-
ably rely upon such hearsay" in reaching their conclusions. *Id.* at
938. The court stressed that "the fact that [the expert witness]
relied upon inadmissible evidence is [ ] less an issue of admissibili-
ty for the court than an issue of credibility for the jury." *Ibid.*
(citation omitted).

In *United States v. Dukagjini,* the Second Circuit reaffirmed
*Locascio* and held that "an expert witness may rely on hearsay
evidence while reliably applying expertise to that hearsay evi-
dence, but may not rely on hearsay for any other aspect of his
testimony." 326 *F.*3d 45, 58 (2d Cir.2003), *cert. denied,* 541 *U.S.*
1092, 124 *S.Ct.* 2832, 159 *L.Ed.*2d 259 (2004). Essential to the
Second Circuit's conclusion was that the expert was "relying on
his conversations with non-testifying witnesses and co-defendants
in order to prove 'the truth of the matter asserted' about the
meaning of the [ ] conversations." *Id.* at 59 (citing *Fed.R.Evid.*
801(c)). *See also State v. Henry,* 72 *Conn.App.* 640, 805 *A.*2d 823,
837 (affirming trial court's admission of gang expert's testimony
based on hearsay because "[a]n expert may base his [or her]
opinion on facts or data not in evidence, provided they are of a
type reasonably relied on by experts in the particular field")(inter-
nal quotation marks omitted), *certif. denied,* 262 *Conn.* 917, 811
*A.*2d 1293 (2002); *Davis, supra,* 268 *Ill.Dec.* 829, 779 *N.E.*2d at 458
(rejecting defendant's hearsay argument and finding expert's
knowledge of gangs based on information of type reasonably relied
on by expert's in field of street gangs); *cf. State v. DeShay,* 669
*N.W.*2d 878, 888 (Minn.2003)(concluding it was harmless error to

admit gang experts testimony that was "duplicative and of little real assistance to the jury").

 In *People v. Gamez*, the defendant sought to exclude the expert's opinion because the expert's testimony was based primarily on inadmissible hearsay from interviews with other gang members. 235 *Cal.App.*3d 957, 286 *Cal.Rptr.* 894, 898 (1991), *disapproved on other grounds, Gardeley, supra*, 59 *Cal.Rptr.*2d 356, 927 *P.*2d at 725. In rejecting the defendant's claim, the court stated:

> We fail to see how the officers could proffer an opinion about gangs, and in particular about gangs in the area, without reference to conversations with gang members.... To know about the gangs involved, the officers had to speak with members and their rivals. Furthermore, the officers did not simply regurgitate that which they had been told. Rather, they combined what they had been told with other information, including their observations, in establishing a foundation for their opinions. The statements of gang members, which in part formed the bases of the officers' opinions, were not recited in detail during the officers' testimony but were referenced in a more general fashion along with other, corroborating information.
>
> [*Id.* at 899–900 (footnote omitted).]

We are in accord with the reasoning of the out-of-state cases that reject arguments similar to defendant's. We conclude that the testimony of Vazquez did not compromise defendant's confrontation rights and was properly admitted. In formulating his testimony regarding the hierarchy, discipline, and operations of MS–13, Vazquez relied on information received from gang-member interviews, his and other officers' field observations, and seminars. As the Appellate Division observed, the "myriad of interviews upon which [Vazquez] based his knowledge of the subject are the kind of sources ordinarily utilized by experts in sociological studies." In order to learn about gang activity, unless the expert had infiltrated a gang, it would be expected that the officer would obtain information of gang activities from gang-member interviews. That is the type of information reasonably relied on by police officers in investigating gangs. Moreover, Vazquez did not merely parrot out-of-court statements in rendering his opinion. Based on his combined experiences of gang-member interviews, numerous hours of seminar instruction, and

multiple conversations with fellow officers, he provided a coherent assessment of the structure, operations, and disciplinary rules of MS–13. That testimony gave the jury a context in which to evaluate defendant's statement and the testimony of former MS–13 member Galdamez. Further, the trial court limited Vazquez's testimony to a specific area and the prosecutor did not go beyond that admonition in eliciting the expert's testimony.

We caution that trial courts must delicately balance the permissible uses of expert testimony and a defendant's fundamental right to cross-examine his accusers. The expert may not serve merely as a conduit for hearsay statements of gang members who have been interviewed by the expert but not called as witnesses. In other words, the expert may not be used to perform an end run around a defendant's right of confrontation. *See Dukagjini, supra,* 326 *F.*3d at 58–59 (observing that "[w]henever a court permits a case agent ... to testify as an expert, there is a significant risk that, if the witness digresses from his expertise, he will be improperly relying upon hearsay evidence and may convey hearsay to the jury").

In sum, we conclude that the trial court did not abuse its discretion in finding Vazquez was qualified as an expert and that his testimony would be helpful for the jury to understand the issues in the case. Vazquez's testimony covered the street gang hierarchy, organization, and discipline, topics that were beyond the understanding of persons of average knowledge, education, and experience. That testimony was properly admitted to assist the jury in understanding the evidence and determining whether the State proved defendant was an accomplice in causing the death of a fellow gang member. Although portions of the expert's testimony may have been based on interviews of other gang members, we find that source, along with the other sources used by Vazquez, was sufficiently reliable to overcome defendant's hearsay complaint. We affirm the trial court's admission of Vazquez's expert testimony.

## V.

We make one final observation. Even though the trial court may find a witness qualified to give an expert opinion, the court should carefully weigh whether the prejudicial effect of that evidence outweighs its probative value. *See Harvey, supra,* 151 *N.J.* at 184, 699 *A.*2d 596. *New Jersey Rule of Evidence* 403 provides that relevant evidence may be excluded if its probative value is substantially "outweighed by the risk of [ ] undue prejudice, confusion of issues, or misleading the jury." At the time the trial court holds a hearing to determine the admissibility of proposed expert testimony, the court should weigh its probative value against undue prejudice pursuant to the rule.

We note also that when the expert witness is an investigating officer, the expert opinion may present significant danger of undue prejudice because the qualification of the officer as an expert may lend credibility to the officer's fact testimony regarding the investigation. That is a delicate situation that requires the trial court to carefully weigh the testimony and determine whether it may be unduly prejudicial. Trial courts have discretion and should exercise it, where appropriate, to limit the scope of such testimony. In all cases where expert testimony is allowed, the trial court, as it did in this case, should give a limiting instruction to the jury "that conveys to the jury its absolute prerogative to reject both the expert's opinion and the version of the facts consistent with that opinion. . . ." *Berry, supra,* 140 *N.J.* at 304, 658 *A.*2d 702.

## VI.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA-SOTO—7.

*Opposed*—None.