**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0358-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

EUGENE R. CADY,

     Defendant-Appellant.

_____

> Argued January 14, 2020 – Decided February 12, 2020
>
> Before Judges Hoffman, Currier and Firko.
>
> On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 13-06-0597.
>
> Alan Dexter Bowman argued the cause for appellant.
>
> Michele C. Buckley, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney; Frank L. Valdinoto, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Eugene Cady was tried before a jury and found guilty of first-degree murder and other offenses, as charged in a Union County indictment. Defendant appeals from the judgment of conviction entered by the trial court. We affirm.

I.

In Indictment No. 13-06-0597, defendant was charged with the first-degree murder of Kason Wilson, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count two); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count three).

The indictment stems from a shooting. On August 21, 2011, Officer James Edgar of the Linden Police Department responded to the 900 block of Union Street in Linden at approximately 10:50 p.m., after receiving a call of possible gunshots. Upon arrival, Edgar observed a man dead in the street with three bullet wounds. He recognized the man from the community as Kason Wilson. Edgar also observed three spent shell casings, a spent projectile, and a small amount of brain matter near the man's body in the street.

We derive our facts from the testimony presented at trial. Earlier in the night following a birthday party in Linden, defendant, a member of the Rollin

30's Crips gang, took a nine-millimeter handgun from a closet in the apartment where the party was held. He walked up to the victim on Union Street, shook his hand, and asked, "[y]ou remember me?" before pulling out a gun and shooting him three times—once in the chest and, as the victim fell to the ground, twice in the back of the head.

After the shooting, defendant and an individual known as Loco, a Crips gang member and a subordinate of defendant, returned to the apartment. Defendant told several individuals at the apartment that he walked up to the victim on Union Street, and shook his hand, before stating, "[y]ou remember me?"

Following the incident, Dyanne Simons spoke to defendant in the apartment. She told defendant Wilson was killed around the corner, and defendant answered, "[y]eah, I know. I did that." Another Rollin 30's Crips member, Anthony Pearson, attended the birthday party. After defendant and Loco left the apartment, Pearson heard two gunshots. Ultimately, defendant was arrested on September 5, 2011.

At trial, the State called Lieutenant Michael Sanford, a ballistics expert, to testify. Sanford performed a "bullet identification" analysis and opined that the bullet projectiles recovered next to Wilson's body correlated to a homicide

in Elizabeth and came from the same gun. Defense counsel objected to Sanford's testimony and requested a cautionary instruction to the jury regarding evidence related to the firearm. The trial court provided a cautionary instruction to the jury, which was not objected to by defense counsel. The clarifying instruction stated:

> The witness testified that the firearm, he believes, was utilized in a prior homicide in Elizabeth, New Jersey. Mr. Cady is not being charged with that homicide. You are not to consider that aspect of the testimony in any regard as to the charges at issue in this case. The fact, that is the asserted fact that the firearm may have been utilized in a separate homicide, may be testified to in more proper context through additional witnesses, but I want you to know now there's no allegation and there will be no proofs offered in this case that Mr. Cady utilized that firearm in the Elizabeth homicide.

Sergeant Gary Webb, who was employed by the Union County Prosecutor's Office, was assigned to the Guns, Gangs, Drugs, and Violent Crimes Task Force. Webb testified about the Rollin 30's Crips and the G-Shine Bloods' gang activity, organization, and hierarchy. He confirmed defendant was a member of the Rollin 30's Crips, and the victim "was believed to be the highest-ranking G-Shine Blood on the street in Linden."

The State also subpoenaed Milad Shenouda, a member of the Rollin 60's Crips, to testify. In August of 2012, Shenouda and defendant shared a prison

4

cell at the Union County jail. Shenouda knew defendant as "Lil-490." Shenouda testified that defendant informed him that he was a member of the Rollin 30's Crips, and that he murdered Kason Wilson, a "G-Shine Blood," near the tracks in Linden.

Following a sixteen-day trial, a jury found defendant guilty on all counts. The trial judge sentenced defendant to forty-two years of imprisonment subject to a mandatory eighty-five percent period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43.7.2, for the murder conviction, and to concurrent seven-year terms with forty-two months of parole ineligibility for the weapons offenses.

After the trial court sentenced defendant, he filed this appeal.[1] He presents the following arguments for consideration:

> POINT I.
>
> THE TRIAL COURT ERRED IN ADMITTING AN UNRELIABLE EXPERT OPINION THAT THE THREE PROJECTILES RECOVERED HEREIN WERE FIRED FROM THE SAME WEAPON USED IN A PRIOR HOMICIDE IN ELIZABETH.
>
> a.    INTRODUCTION.
>
> 1.    THE INADMISSIBLE EVIDENCE.

---

[1] On October 11, 2017, defendant filed an amended notice of appeal.

A-0358-17T4

2.    THE LACK OF FOUNDATION.

b.    THE "SAME GUN" EVIDENCE SHOULD HAVE BEEN EXCLUDED.

1.    THE UNRELIABLE EXPERT EVIDENCE.

2.    THE LAW AS TO RELEVANT EVIDENCE.

POINT II.

THE STATE'S PROFILING AND CONCOMITANT ACCUSAL OF A BLACK FEMALE JUROR AS HAVING IMPROPER CONTACT WITH ANOTHER PERSON OUTSIDE THE COURTHOUSE DENIED APPELLANT A FAIR TRIAL.

a.    PERTINENT FACTS.

b.    THE STATE'S UNEXPLAINED PROFILING OF JUROR [NUMBER SEVEN] VIOLATED DUE PROCESS AND RENDERED THE TRIAL UNFAIR.

i.    BATSON v. KENTUCKY

ii.    THE VERDICT SHOULD BE SET ASIDE OR A REMAND ORDERED.

POINT III.

THE COURT ERRED IN PERMITTING THE VIDEO OF THE INSIDE OF THE COUNTY JAIL TO BE SHOWN TO THE JURORS.

A-0358-17T4

POINT IV.

THE PROSECUTOR'S COMMENTS IN SUMMATION DENIED APPELLANT A FAIR TRIAL.

a.   THE COMMENTS.

b.   APPELLANT WAS DENIED A FAIR TRIAL.

POINT V.

THE COURT ERRED AS TO THE SCOPE OF THE GANG EVIDENCE WHICH IT ADMITTED.

We reject these contentions and affirm.

## II.

Defendant argues that the trial court abused its discretion by allowing Sanford to testify concerning the bullet projectiles recovered in this case and their correlation to a homicide in Elizabeth. Defendant further contends that Sanford's expert opinion was unreliable, and "did not have a sufficient scientific basis to produce uniform and reasonably reliable results to contribute materially to the ascertainment of the truth[,]" citing State v. Torres, 183 N.J. 554, 568 (2005).

When reviewing the admission or exclusion of evidence, we afford "[c]onsiderable latitude" to a trial judge's determination, examining "the decision for abuse of discretion." State v. Kuropchak, 221 N.J. 368, 385 (2015)

A-0358-17T4

(alteration in original) (quoting State v. Feaster, 156 N.J. 1, 82 (1998); see also

State v. Jenewicz, 193 N.J. 440, 456 (2008) (stating "the abuse-of-discretion

standard" is applied "to a trial court's evidentiary rulings under Rule 702")).

Importantly, "[u]nder th[is] standard, an appellate court should not substitute its

own judgment for that of the trial court, unless 'the trial court's ruling was so

wide of the mark that a manifest denial of justice resulted.'" Kuropchak, 221

N.J. at 385-86 (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

Expert testimony is admissible if it meets three criteria:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror;
>
> (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and
>
> (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [State v. Henderson, 208 N.J. 208, 297 (2011) (quoting Jenewicz, 193 N.J. at 454).]

When considering proffered expert testimony, the trial court exercises

discretion in determining "[t]he necessity for, or propriety of, the admission of

expert testimony, and the competence of such testimony . . . ." State v. Zola,

112 N.J. 384, 414 (1988). "The qualifications of an expert and the admissibility

of opinion or similar expert testimony are matters left to the discretion of the

8

trial court." State v. McGuire, 419 N.J. Super. 88, 123 (App. Div. 2011) (citing Torres, 183 N.J. at 572; State v. Summers, 176 N.J. 306, 312 (2003)). "The party offering the evidence has the burden of proof to establish its admissibility." Torres, 183 N.J. at 567.

> The proponent of expert testimony must demonstrate that it would "enhance the knowledge and understanding of lay jurors with respect to other testimony of a special nature normally outside of the usual lay sphere." State v. Kelly, 97 N.J. 178, 209 (1984) (quoting State v. Griffin, 120 N.J. Super. 13, 20, (App. Div. 1972)). In addition, the proponent must demonstrate that the expert's testimony would be reliable. Ibid.
>
> [State v. J.Q., 252 N.J. Super. 11, 25 (App. Div. 1991).]

Defendant points to Sanford's testimony on cross-examination in support of his argument that the State failed to show that Sanford is reliable:

> Q. The last indication is that acquisition of a weapon was used to discharge cartridges is indispensable to the comparative effort you were asked to undertake?
>
> A. No.
>
> Q. What did you mean when you said that?
>
> A. I mean that, although I can opine that the projectiles were fired from the same weapon and the cartridge cases were fired from the same weapon, without having a subject weapon you cannot positively confirm that they were the same weapon firing cartridge cases and projectiles.

A-0358-17T4

Q.    Okay.

. . . .

Q.    So it's fair to say that scientifically you can't make a definitive statement with respect to the projectiles and the cartridges in this case, in those two instances, whether or not they compare?

A.    I can have opinions on that, but I do not—they're not scientific opinions.

Q.    You can't say to a degree of scientific certainty that's the case, correct?

A.    Correct.

Here, the judge issued a cautionary instruction to the jury advising them how they could consider Sanford's testimony. Moreover, defense counsel agreed to the cautionary instruction. The judge properly informed the jury that defendant was not being charged with the prior homicide, and that they were not to consider the prior homicide with respect to the current charges against defendant.

We also consider whether the trial judge's admission of Sanford's testimony "was sufficiently prejudicial to have [had] the capacity to bring about an unjust result." State v. Thompson, 405 N.J. Super. 76, 81 (App. Div. 2009). Put differently, Sanford's testimony must be analyzed under the harmless error

standard.  See Ragusa v. Lau, 233 N.J. Super. 84, 89 (App. Div. 1989), rev'd on other grounds, 199 N.J. 276 (1990).

Under Rule 2:10-2, "[a]ny error or omission shall be disregarded . . . unless it is of such a nature as to have been clearly capable of producing an unjust result . . . ."  This court must determine "whether in all the circumstances there [i]s a reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits . . . ."  State v. Macon, 57 N.J. 325, 338 (1971); see also Thompson, 405 N.J. Super. at 81 ("Even if the State elicits improper expert testimony during a criminal trial, a reversal of the defendant's conviction is required only if that testimony was sufficiently prejudicial to have the capacity to bring about an unjust result.").

"The harmless error standard requires that there be some degree of possibility that [the error] led to an unjust result.  The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached."  State v. Lazo, 209 N.J. 9, 26 (2012) (alterations in original) (internal quotation marks omitted).

As the trial court recognized, Sanford's testimony about the firearm used in the two homicides was foundation for Webb's testimony about gang activity between the Rollin 30's Crips and the G-Shine Bloods.  In light of the proofs in

this case, which included defendant's admission of the shooting to several individuals, there cannot be "a reasonable doubt" that defendant was convicted as a result of "a fair trial and a fair decision on the merits." See Macon, 57 N.J. at 338. Because defendant cannot demonstrate that Sanford's testimony about ballistics "led the jury to a verdict it otherwise might not have reached," the trial judge's admission of Sanford's testimony was harmless error and does not warrant reversal.

## III.

Defendant further asserts the State's profiling and concomitant accusal of a black female juror having improper contact with another person outside of the courtroom denied him a fair trial. During the trial, the judge informed the parties that "[i]t was brought to [his] attention last evening that an individual who was a spectator yesterday, who is also known as a Rollin 30's Crips member, approached one of the jurors and had a conversation" during a lunch break. The judge further stated that he was concerned that "this juror did not report any such contact."

The trial judge proceeded to voir dire juror seven, a black woman. The following exchange ensued:

> THE COURT: Yesterday I gave the jury a longer lunch period, an hour [fifteen] minutes.

12

JUROR NO. [SEVEN]: Right.

THE COURT: And you and your colleagues, as I've noted repeatedly, have been remarkably prompt–which I really appreciate. I feel–I hope you feel, and your fellow jurors feel that I'm prompt as well.

JUROR NO. [SEVEN]: Right.

THE COURT: You were substantially late yesterday.

JUROR NO. [SEVEN]: Uh-huh.

THE COURT: And I thought about it at the time, should I bring this to your attention, should I question you, but I didn't want to embarrass you.

JUROR NO. [SEVEN]: Okay.

. . . .

THE COURT: It was brought to my attention that somebody approached you during the lunch hour.

JUROR NO. [SEVEN]: No. No one approached me.

THE COURT: That you had a conversation with somebody who had been in the courtroom as an observer for a number of minutes.

JUROR NO. [SEVEN]: No.

THE COURT: Let me ask you this: [w]ere you outside– were you outside this building during the lunch hour? Did you leave the building for the lunch hour?

JUROR NO. [SEVEN]: Yes.

THE COURT: Were you on the front veranda area?

JUROR NO. [SEVEN]: No, I was in the pizza parlor with my colleagues.

THE COURT: So are you indicating to me that nobody– that you had no conversation with anybody that was not a juror during your–during the entirety of the lunch hour?

JUROR NO. [SEVEN]: Yes, I am.

THE COURT: Okay. I'm going to ask–[are] there any additional questions from the lawyers?

[DEFENSE COUNSEL]: No, [Y]our [H]onor.

THE COURT: I'm going to wait for a moment.

[PROSECUTOR]: I guess the only other question is . . . when you returned from lunch did you walk through the main front door?

JUROR NO. [SEVEN]: I went to the rear, found out the rear was not open, I had to go around the front.

THE COURT: Were you with your fellow jurors then?

JUROR NO. [SEVEN]: Not at that time. I was by myself.

THE COURT: How come you were by yourself?

JUROR NO. [SEVEN]: I had to give my son my vehicle because I had to pick up my child, so there was no way to pick up my daughter so he had to come get the vehicle from me, and I had to somehow get it to him and hurry up back.

> THE COURT: So when you were coming in the front of this building, you're telling me you had no communication with anybody else?
>
> JUROR NO. [SEVEN]: No, I came through the guard entrance. The guard, basically, he took my belongings. My earrings kept going off, for some reason, and I was trying to hide my juror badge. He said, "Take your juror badge off." I took it off. There was a young man he was talking to that was in front of me, but no, I never talked to anyone.

The judge then interviewed a white juror. Defendant asserts that juror number seven was falsely identified because she is black, and the "process of interfering with her dignity and composure rendered the trial unfair because of its unknown affect."

We apply an abuse of discretion standard to the trial court's determinations regarding claims of juror taint. State v. R.D., 169 N.J. 551, 559-60 (2001). The Sixth Amendment to the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee criminal defendants the right to an impartial jury during trial. Id. at 557. Criminal defendants are "entitled to a jury that is free of outside influences and [that] will decide the case according to the evidence and arguments presented in court in the course of the criminal trial itself." State v. Williams, 93 N.J. 39, 60 (1983).

"The securing and preservation of an impartial jury goes to the very essence of a fair trial." Ibid. "[If] during the course of the trial it becomes apparent that a juror may have been exposed to extraneous information, the trial court must act swiftly to overcome any potential bias and to expose factors impinging on the juror's impartiality." R.D., 169 N.J. at 557-58 (citing State v. Bey, 112 N.J. 45, 83-84 (1988)).

Our Supreme Court recognizes that "the trial court is in the best position to determine whether the jury has been tainted." R.D., 169 N.J. at 559. The trial judge must "consider the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings." Ibid. The trial judge has the discretion to grant a new trial based on juror taint. Id. at 558.

In the instant matter, we find no basis to second-guess the trial judge's handling of the jury issue. After learning of the reported incident, the judge promptly conducted a voir dire of the relevant jurors. Nothing in the record indicates that juror number seven or any other juror felt intimidated, and they were otherwise able to decide the matter in a fair and impartial manner.

16

Accordingly, we find no abuse of the trial judge's discretion in allowing juror number seven to continue on the case.

Defendant also cites to a litany of cases involving racial profiling, State v. Lee, 190 N.J. 270 (2007), peremptory strikes, Batson v. Kentucky, 476 U.S. 79 (1986), and other discriminatory practices, Swain v. Alabama, 380 U.S. 202 (1965). There is no evidence of a racial motive, discriminatory practice, or discriminatory effect based upon our careful review of the record. Here, juror number seven was interrogated in a respectful way regarding a mistakenly perceived incident. As such, defendant has not shown any prejudice or undue consequence.

IV.

Next, defendant argues that the trial judge erred by permitting the jury to view a short video of defendant speaking with the State's witness, Anthony Pearson, at the county jail during the trial. There was no audio, only video. The audio was presented to support the claim of witness tampering. The State contended that defendant attempted to persuade Pearson not to testify.

Defendant argues that the soundless video has no probative value and the conditions of the penal facility resulted in prejudice and undue influence on the jurors, referring to it as the "foreboding belly and bowels of a correctional

facility." Defendant further posits that, "[t]he nature of an inmate's existence in the institution and concomitant survival is immediately a source of provoked speculation," and that "[c]learly, all of the jurors were influenced by the conditions in a penal facility regardless of the cautionary instruction or other masking tools applied."

In support of this argument, defendant relies on cases involving instances where a defendant was required to appear before a jury in prison garb and/or restraints. See State v. Artwell, 177 N.J. 526, 539 (2003) (finding the practice of producing witnesses in prison garb prior to the decision did not advance an essential state interest and reversing the defendant's conviction). Defendant argues the depiction of the jail created the impression that the inmates, including himself, were all guilty and dangerous, and that as a result, the risk of undue prejudice outweighed the probative value of the video under Rule 403.

Artwell involved a witness appearing in court in prison garb, at the instruction of the State. Id. at 531. There is no analog here, as the video was offered by the State as evidence of witness tampering. Furthermore, the trial judge conducted a Rule 404(b) hearing relative to defendant's attempt to persuade Pearson not to testify.

Additionally, the judge properly conducted an analysis pursuant to State v. Cofield, 127 N.J. 328 (1992). In determining the analysis required by Rule 404(b), the Cofield Court provided four factors to be considered:

1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[127 N.J. at 338.]

The judge determined that defendant's request to convince Pearson not to testify was relevant to a material issue (prong one), and the testimony and accompanying evidence was clear, convincing, and probative (prongs three and four).[2] The trial judge considered the video and testimony elicited at the hearing. The video showed that the conversation lasted for over four minutes, during which defendant would periodically get up and return to the cell, while "looking

---

[2] The second Cofield prong, that the evidence be reasonably close in time and close in kind, was irrelevant, as the incident took place while defendant was incarcerated during the trial and the issue involved the witness the State planned to have testify.

A-0358-17T4

to make sure that he was able to speak in private . . . ." Because the trial judge's findings are supported by sufficient credible evidence in the record, and a limiting instruction was given to the jury, we conclude the court's decision to admit the video was not a mistaken exercise of discretion.

V.

Defendant further argues that remarks the prosecutor made in summation denied him a fair trial. We disagree.

The record shows that during the prosecutor's summation, the jury was told "[d]efendant was arraigned, he should have pled guilty . . . ." The judge sustained defense counsel's objection and immediately instructed the jury that "it's an individual's constitutional right to go to trial. The State has the burden of proof . . . [and] the burden never shifts to the [d]efense." Defense counsel also objected to the prosecutor's characterization of defendant's interaction with Shenouda, a Crips member from Elizabeth, because the intended message was to "go back to [your] boys . . . [and] tell them, [I am] not a man to be toyed with . . . ." The trial judge sustained the objection raised by defense counsel. Defendant also asserts the prosecutor's last comment that "defendant is a stone-cold-blooded assassin," was improper.

20

Prosecutors are "expected to make vigorous and forceful" summations, and they "are afforded considerable leeway" so long as their remarks are tethered to the evidence presented and the reasonable inferences to be drawn therefrom. State v. Frost, 158 N.J. 76, 83 (1999) (citing State v. Harris, 141 N.J. 525, 559 (1995); State v. Williams, 113 N.J. 393, 447 (1988)). However, prosecutors may "not make inaccurate legal or factual assertions during a trial and . . . must confine their comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence." State v. Smith, 167 N.J. 158, 178 (2001) (citing Frost, 158 N.J. at 86; State v. Marks, 201 N.J. Super. 514, 534 (App. Div. 1985)).

In determining whether to reverse a conviction for prosecutorial misconduct, including improper remarks during summation, an appellate court must decide whether "the prosecutor's misconduct was so egregious that it deprived the defendant of a fair trial." Frost, 158 N.J. at 83 (citing State v. Ramseur, 106 N.J. 123, 322 (1987); State v. Siciliano, 21 N.J. 249, 262 (1956)). On appeal, we must consider whether the defendant objected to the remarks, "whether the remarks were withdrawn[,]" and "whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Ibid. (citing State v. Marshall, 123 N.J. 1, 153 (1991); Ramseur, 106 N.J. at 322-

23; State v. G.S., 278 N.J. Super. 151, 173 (App. Div. 1994), rev'd on other grounds, 145 N.J. 460 (1996); State v. Ribalta, 277 N.J. Super. 277, 294 (App. Div. 1994)).

The decision whether to issue a curative instruction "is one that is peculiarly within the competence of the trial judge, who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting." State v. Winter, 96 N.J. 640, 646-47 (1984). Generally, a curative instruction eliminates prejudice if it instructs jurors to disregard a specific statement and is "accomplished without delay." State v. Vallejo, 198 N.J. 122, 134-35 (2009). "The adequacy of a curative instruction necessarily focuses on the capacity of the offending evidence to lead to a verdict that could not otherwise be justly reached." Winter, 96 N.J. at 647.

The judge found the prosecutor's comment about defendant's exchange with Shenouda was inappropriate but noted the prosecutor may suggest to the jury that an inference could be drawn from the evidence in the record. We are satisfied the comments were not so egregious to deprive defendant of a fair trial.

VI.

Lastly, defendant argues the trial judge erred by not performing the Rule 403 analysis required for admission of gang-related evidence of motive.

22

Defendant does not dispute that gang-related evidence is admissible and helpful to juries under Torres, 183 N.J. at 574-77. However, defendant claims that "the jury was inundated with evidence of proclivity and foul character."

The trial judge qualified the gang-related evidence with a specific instruction to the jury: "you may not decide that just because [d]efendant is a member of a street gang or that the decedent was a member of a street gang, . . . [d]efendant must be guilty of the present crimes. I have admitted this evidence only to help you decide the specific question of motive."

The gang-related evidence was introduced as background information to assist the jury in determining motive. Based upon our review of the record, the evidence was not elicited, as defendant seems to imply, to associate defendant with other homicides. We discern no abuse of discretion and defer to the trial judge's evidentiary ruling here as to the gang-related evidence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION