**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2490-14T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DENNIS THIGPEN, JR.,

    Defendant-Appellant.

_____

Argued May 31, 2017 — Decided August 11, 2017

Before Judges Koblitz, Rothstadt and Sumners.

On appeal from Superior Court of New Jersey,
Law Division, Ocean County, Indictment No.
10-07-1359.

Tamar Y. Lerer, Assistant Deputy Public
Defender, argued the cause for appellant
(Joseph E. Krakora, Public Defender, attorney;
Ms. Lerer, of counsel and on the brief).

Shiraz Imran Deen, Assistant Prosecutor,
argued the cause for respondent (Joseph D.
Coronato, Ocean County Prosecutor, attorney;
Samuel Marzarella, Chief Appellate Attorney,
of counsel; Mr. Deen, Assistant Prosecutor,
on the brief).

PER CURIAM

A jury convicted defendant Dennis Thigpen, Jr. of first-degree conspiracy to commit murder, N.J.S.A. 2C:11-3(a) and N.J.S.A. 2C:5-2 and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b).[1] Defendant had been indicted for murder. The State's theory was that the victim was killed because the Bloods street gang believed he had told the police about a member's participation in an armed robbery of a restaurant. After two hung juries on murder and possession of a gun for an unlawful purpose, the court dismissed those charges at the State's request. On appeal, defendant argues the court made various incorrect and prejudicial evidentiary rulings, improperly allowed the jury to view recorded witness statements in the jury room, and gave him an overly harsh sentence. After reviewing the record in light of the contentions advanced on appeal, we affirm the conviction and the sentence, but remand for the limited purpose of correcting a typographical error in the judgment of conviction.

Prior to trial, the court granted the State's motion to admit gang evidence under N.J.R.E. 404(b) as proof of motive. The evidence consisted of expert testimony concerning the history,

---

[1] The judgment of conviction erroneously states that defendant was convicted of possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a).

makeup, hierarchy and general background information of the Bloods.

The trial revealed the following facts. Defendant's co-defendant, Dyshon Ragland,[2] held the second-highest rank within the Bloods. At least one hundred people reported to him. Ragland lived with his girlfriend, Z.J.,[3] in her apartment at the High Point apartment complex where he engaged in gang activity.

Bloods member N.R. testified that on February 27, 2008, Ragland committed an armed robbery of a restaurant in Toms River. After the robbery, N.R. and Ragland escaped in a car with other Bloods members. They discussed the robbery in the car, in the presence of eighteen-year-old Bloods member Anthony Skyers. N.R. and Ragland were both charged with the robbery in May 2008.

On the afternoon of June 5, 2008, Skyers was arrested with another person for underage possession of alcohol. Skyers was released the same day with a summons, while the other man was jailed for the additional charge of possession of marijuana. A police officer testified that Skyers did not provide any

---

[2] Ragland was tried separately and, after being found guilty of murder and related offenses, was sentenced to forty-five years in prison.

[3] Given the nature of the crime, we use initials in place of the names of the State's witnesses.

information about Ragland's participation in the armed robbery of the restaurant.

Ragland's girlfriend Z.J. testified that later that evening, she and Ragland were at her apartment when Ragland received "between five to seven phone calls." Ragland "seemed to be very upset" at the nature of the phone calls. He told Z.J., referring to Skyers, "I hope he didn't do what I think he did, because if he did, I'm going to have to shut him up." Ragland left the apartment and returned alone. Fellow Bloods member C.B. arrived at the apartment shortly thereafter. Ragland and C.B. then left together.

Ragland returned alone to the apartment shortly before 1:00 in the morning. Five minutes later, defendant arrived at the apartment. Defendant's "eyes were big like in shock" and he was "very sweaty." According to Z.J., defendant looked "[k]ind of upset" but more "frightened." Z.J. asked defendant why he "look[ed] like he killed someone." Defendant did not answer. He and Ragland went to the bathroom together, shut the door and talked with the water running. Z.J. could not hear what they said. Defendant left the apartment five minutes later.

Later that morning, Skyers was found dead in the woods behind the High Point apartment complex with two gunshot wounds in the

back of his head. A witness who lived near the scene reported hearing the gunshots at approximately 9:20 p.m. the night before.

More than a year after the murder, C.B. and his cousin, B.N., also a Bloods member, were arrested for multiple counts of unrelated armed robberies. The State called both men as witnesses. C.B. testified that on June 5, 2008, Ragland called him and ordered him to go to Ragland's apartment in High Point. When C.B. arrived at Ragland's apartment that night, Ragland told C.B. that he wanted to show C.B. something. Ragland took C.B. to the woods behind the High Point apartment complex and showed C.B. Skyers's dead body. Ragland told C.B. that he "killed [Skyers]," that "[Skyers] had to go" and that "this is what happens when somebody snitches."

C.B. testified that before Skyers's murder in June 2008, defendant was trying to become a member of the Bloods. By the fall of 2008, defendant was a new member of the Bloods and immediately held a high-ranking positon, which was unusual because new members usually start at a low-level position and work their way up by committing crimes. Other Bloods members disapproved of defendant's fast assent to a high-ranking level.

In September 2008, defendant told some members that he gained his high rank because he killed Skyers. C.B. testified that defendant talked about Skyers's murder a second time while he, defendant and other Bloods members were riding in a car on their

way to Newark. Defendant complained that the Bloods members were not showing him the respect he deserved for killing Skyers.

C.B.'s cousin B.N. testified that in the end of June or early July 2009, defendant spoke about himself, saying "he's not a bad person" but that "the way [he] was raised, when people snitch on you, you got to handle that." B.N. asked defendant if he was talking about Skyers and defendant responded "yeah." Defendant also told B.N. the way he got his rank was "the whole thing with [Skyers]."

R.C., defendant's girlfriend who lived with him at the time of the murder, gave a statement to the police thirteen months after the murder. Six months before the statement, defendant told her that he killed an eighteen-year-old boy. Defendant said he killed Skyers because Skyers was suspected to have "snitched" or was going to "snitch" on Ragland. Defendant thought Skyers was an informant because Skyers was released from jail shortly after having been arrested. R.C. said defendant admitted to murdering Skyers because defendant was "stressed out" about the killing.

At trial, R.C. recanted her prior statement, explaining that she had lied to the police about defendant's involvement in the Skyers's murder because the police threatened that if she did not give a statement, they would arrest her and take her children

away.  When asked why she told the police that defendant murdered Skyers, R.C. responded, "That's what I heard on the streets."

J.V. testified at trial that she lived with R.C. and defendant in 2008.  She and defendant "were real close."  J.V. testified defendant revealed to her that "[h]e murdered the boy" in the woods.  Defendant told J.V.:

> he lured [Skyers] to the woods and told [Skyers] to walk up ahead of him and he shot [Skyers].  The first time the safety was on the gun, it didn't go off and [Skyers] turned around and said what are you doing? [Defendant] said, I'm just kidding, go ahead. And then [Skyers] turned around and [defendant] shot him again.

According to J.V., defendant murdered Skyers because Skyers was suspected to have "ratted out [defendant's] friend that was locked up, like a snitch."  Defendant said before the murder, the Bloods members were debating about who would kill Skyers and defendant "was the only one that had the balls to do it."  Defendant bragged: "I killed the kid, I could do it again, it's nothing to kill somebody."  Defendant talked about murdering Skyers "[a]lmost every day."

After his arrest in July 2009, defendant gave two video-recorded statements to the police denying that he murdered Skyers. Defendant stated at the time of the murder he was in North Carolina and did not return to New Jersey until August 2008.  Defendant told the police that before the murder, Ragland called him while

7

he was in North Carolina and asked him to kill Skyers because Ragland suspected that Skyers had snitched on him. Defendant said he refused. Ragland called defendant the next day and told defendant that Skyers was dead. Defendant stated Ragland "put his name out there" as the person who killed Skyers and he agreed to go along with it to divert suspicion away from Ragland. Defendant did not testify at trial, but the video statements were admitted into evidence.

Defendant raises the following issues on appeal:

> POINT I: EXTENSIVE TESTIMONY REGARDING THE BLOODS, INTRODUCED IN VIOLATION OF N.J.R.E. 404(b) AND 702, WAS SO INFLAMMATORY THAT IT WOULD HAVE BEEN IMPOSSIBLE FOR A JURY TO DECIDE THE CASE FAIRLY AND IMPARTIALLY. HENCE, DEFENDANT'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL WERE VIOLATED AND HIS CONVICTIONS MUST BE REVERSED.

> POINT II: EXTENSIVE TESTIMONY ABOUT AN ARMED ROBBERY COMMITTED BY A GANG MEMBER WAS UNDULY PREJUDICIAL AND SHOULD NOT HAVE BEEN ADMITTED. ITS IMPROPER ADMISSION NECESSITATES THE REVERSAL OF DEFENDANT'S CONVICTIONS. (Partially Raised Below)

> POINT III: THE IMPROPER ADMISSION OF RAMPANT HEARSAY TESTIMONY THROUGHOUT THE TRIAL PREJUDICED THE DEFENDANT AND NECESSITATES REVERSAL OF HIS CONVICTIONS. (Partially Raised Below)

> POINT IV: BECAUSE NO EVIDENCE WAS PRESENTED OF AN AGREEMENT TO KILL THE VICTIM, THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL ON THE CONSPIRACY CHARGE.

POINT V: BECAUSE THE TRIAL COURT'S DECISION TO ALLOW THE JURY UNFETTERED ACCESS TO VIDEO-RECORDED STATEMENTS WAS ERRONEOUS, DEFENDANT'S CONVICTIONS MUST BE REVERSED.

POINT VI: THE CUMULATIVE IMPACT OF THE ERRORS DENIED DEFENDANT A FAIR TRIAL. (Not Raised Below)

POINT VII: DEFENDANT'S SENTENCE IS EXCESSIVE AND MUST BE VACATED BECAUSE THE COURT FAILED TO ADDRESS MITIGATING FACTORS OR EXPLAIN ITS REASONING FOR FINDING AGGRAVATING FACTORS.

I

Defendant argues in Point I that the jury improperly heard extensive testimony from multiple lay witnesses and an expert witness about the Bloods and defendant's association with the Bloods. Defendant argues that this testimony violated N.J.R.E. 404(b) because it was "extraordinarily prejudicial" to defendant. He further argues the expert testimony also violated N.J.R.E. 702 because it was unreliable and cumulative, reiterating testimony about the Bloods presented by other witnesses.

Defendant also argues as plain error that the court's jury instruction in the preliminary and final charge regarding gang testimony violated State v. Blakney, 189 N.J. 88, 93 (2006), which requires the court to issue a curative instruction at the time other crimes evidence is presented. He argues the court's instruction during its final charge, was misleading.

We give great deference to the decision of the trial court on the admissibility of evidence under N.J.R.E. 404(b). State v. Barden, 195 N.J. 375, 390 (2008). "Only where there is a clear error of judgment should the trial court's conclusion with respect to that balancing test be disturbed." Id. at 391 (quoting State v. Marrero, 148 N.J. 469, 483 (1997)).

N.J.R.E. 404(b) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive . . . ." In State v. Cofield, our Supreme Court enunciated a four-part test for the admissibility of other crimes or wrongs evidence: "(1) The evidence of the other crime must be admissible as relevant to a material issue; (2) It must be similar in kind and reasonably close in time to the offense charged; (3) The evidence of the other crime must be clear and convincing; and (4) The probative value of the evidence must not be outweighed by its apparent prejudice." State v. Cofield, 127 N.J. 328, 338 (1992).

The admissibility of expert testimony is governed by N.J.R.E. 702. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by

knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." N.J.R.E. 702 requires that: "(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony." State v. Jenewicz, 193 N.J. 440, 454 (2008).

In Torres, the defendant was a gang member involved in ordering the murder of one of the gang's other members. State v. Torres, 183 N.J. 554, 559-62 (2005). The issue before the Court was "whether an experienced police officer who specialize[d] in street gang investigations should be permitted to give expert testimony on 'gang' hierarchy, organization, and discipline." Id. at 559. The Court held that the trial court did not abuse its discretion in finding the officer was qualified as an expert and his testimony would be helpful for the jury. Id. at 579. The Court held, "We are in accord with those jurisdictions that have concluded that testimony explaining the structure, organization, and procedures of street gangs would be helpful to a jury's understanding of the relevant issues at trial." Ibid.

Here, the trial court analyzed the Cofield factors in reaching its decision to admit evidence about the Bloods. Regarding the

first Cofield factor, the court found that the evidence was relevant to show why defendant murdered Skyers, who defendant asserted he did not know, and to show the pecuniary benefit of the higher rank that defendant gained from committing the murder.

The court noted that where motive is at issue, satisfaction of the second prong of Cofield, requiring similarity in crime and closeness in time, is not required, yet substantively satisfied nonetheless. State v. Williams, 190 N.J. 114, 122 (2007); State v. Goodman, 415 N.J. Super. 210, 230 (App. Div. 2010), certif. denied, 205 N.J. 78 (2011). As to the third prong, the court found, based on C.B.'s testimony, "a reasonable juror could be convinced beyond a reasonable doubt that the defendant committed this offense for the reasons stated . . . at the direction of Dyshon Ragland."

The court also found the evidence satisfied the fourth prong of Cofield, that the probative value of the gang evidence outweighed its prejudicial impact. The court explained why it thought the State's gang expert, Keith Bevacqui, would offer valuable evidence as to motive:

> the probative value is very great, that is this evidence explains why someone would murder someone, kill someone, who they don't know, and offer[s] an explanation, that is why someone would do that at the direction of another person and what discipline he would face and what pecuniary benefit he would receive for committing such an act. I think

12

that is purely testimony that is required to be provided by an expert and I'm satisfied that in reviewing the report that was provided and admitted into evidence for purposes of this hearing of Mr. Bevacqui, Keith Bevacqui of the New Jersey State Police, that his report provides the answer, provides an explanation as well as a background as to the Bloods and the relevance and weight of the pecuniary benefit that was given to the defendant for his actions and what disciplinary actions he faced if he did not follow out the order.

During preliminary instructions to the jury, the court cautioned the jury regarding the use of this evidence:

> Now, when we were selecting the jury in this case, I told you that during the course of the trial you will hear references to an allegation that the decedent, Anthony Skyers, and the defendant, Dennis Thigpen, were members of a street gang. It will be up to you to determine if that is true or not true, and whether if it is true, that it has any relevance to a possible motive for the charges set forth in the indictment. I can tell you, however, that you can never use that evidence to conclude that the defendant has a predisposition to commit any crimes or that simply because you find he was a member of a gang or that the victim may have been a member of a gang that the defendant, therefore, must be guilty of the crimes charged in the indictment.

During the final charge, the court gave a similar instruction:

> [Y]ou may not use this evidence to decide that the defendant has a tendency to commit crimes or that he is a bad person. That is, you may not decide that just because the defendant is a member of the street gang, or that decedent was a member of a street gang, the defendant must be guilty of the present crimes. I have

> admitted this evidence only to help you decide the specific question of motive. You may not consider it for any other purpose and may not find the defendant guilty now simply because the State has offered evidence that he was a member of a street gang.

Although inherently prejudicial, testimony about defendant's involvement with the Bloods was directly related to the State's well-supported theory that defendant killed Skyers at Ragland's direction because defendant wanted to join the Bloods. Evidence about the Bloods, its activities and its hierarchical system were probative to defendant's motive. As in Torres, supra, 183 N.J. at 573, the gang expert's testimony was helpful to the jury's understanding of a relevant issue. Further, the court twice gave clear jury instructions to eliminate any undue prejudice. Given the volume of gang references throughout the trial, it did not make sense to point each reference out to the jury with a cautionary instruction.

## II

Defendant argues in Point II as "partially raised" at the trial level, that testimony regarding Ragland's robbery of a restaurant was unduly prejudicial and violated N.J.R.E. 403. Under N.J.R.E. 403, relevant evidence may be excluded if its probative value is substantially outweighed by the risk of undue prejudice.

Testimony about Ragland's robbery was relevant to the State's theory that Ragland ordered defendant to murder Skyers because

14                                                        A-2490-14T2

Skyers was suspected of informing on Ragland about the robbery. Defendant had not robbed the restaurant and the court determined the evidence of Ragland's robbery was not unduly prejudicial to defendant.

## III

Defendant argues in Point III that inadmissible hearsay elicited throughout the trial violated N.J.R.E. 802 and inappropriately bolstered the State's case. Hearsay is an out-of-court statement offered for the truth of the matter asserted. N.J.R.E. 801(c). Hearsay is inadmissible unless it fits within an exception. N.J.R.E. 802.

Defendant argues for the first time on appeal that R.C.'s testimony that she "heard on the streets" that defendant was the killer was improper. Defense counsel did not object to this testimony at trial. When a defendant raises an objection for the first time on appeal we reverse only if the error "is clearly capable of producing an unjust result." R. 2:10-2.

The State logically asserts that defense counsel did not object to R.C.'s statement for strategic reasons because it benefited defendant by offering an alternative source for the information R.C. provided the police. R.C. recanted on the stand and justified how she would know enough about the situation to tell the police defendant had confessed to killing Skyers. R.C.'s

alternative explanation of why she falsely gave the police a statement incriminating defendant was not clearly capable of producing an unjust response.

Defendant further argues that C.B. also offered inadmissible hearsay testimony when he said, that "people" did not "approve of [defendant] having [a high gang] status," and that "some people felt some type of way about him killing [Skyers] that like it was wrong. Then after that, mostly everyone else just felt like people still did not respect the fact that even if he did it, that how, like how he was going to just still pass everyone else in rank."

Defendant argues the court erroneously overruled trial counsel's objection to C.B.'s testimony when it concluded the testimony was not offered for the truth of the matter asserted, but to "give context to a conversation." C.B.'s testimony was not inadmissible hearsay because the State was not attempting to prove the truth of C.B.'s statements, that other Bloods members were dissatisfied, but rather to provide context for C.B.'s testimony regarding defendant's spontaneous confession to Skyers's murder. Defendant was explaining his rapid ascension through the ranks.

Defendant further contends that Z.J.'s testimony that on the night of the murder, she told defendant that he "look[ed] like he killed someone" was inadmissible hearsay because the statement constituted inadmissible lay opinion testimony, in violation of

16

N.J.R.E. 701. Defendant argues that Z.J.'s testimony was particularly prejudicial because her testimony was the only testimony linking Ragland and defendant on the night of the murder. Defense counsel did not object to the statement at trial and thus raises the issue as plain error. It is incredible that the jury would believe Z.J. knew what someone looked like after committing a murder. Z.J.'s testimony was not inadmissible lay opinion but rather a colloquial description of an excited and scared person. Z.J. made the statement while commenting that defendant was "sweaty" and "upset."

We review the trial court's evidentiary rulings for an abuse of discretion. State v. Gorthy, 226 N.J. 516, 539 (2016). None of the rulings complained of by defendant constitutes error that would affect the outcome of the trial.

IV

Defendant argues in Point IV that the State presented no evidence of an agreement between defendant and anyone else and therefore defendant's motion for acquittal on the conspiracy charge should have been granted. When ruling on a motion for a judgment of acquittal, the trial court must determine whether, viewing the State's evidence in its entirety and giving the State the benefit of all favorable testimony as well as favorable inferences which could be reasonably drawn, a reasonable jury

could find guilt of the charge beyond a reasonable doubt. Rule 3:18-1; State v. Reyes, 50 N.J. 454, 458-59 (1967). We apply the same standard used by the trial court in its determination of a defendant's motion for a judgment of acquittal. State v. Tindell, 417 N.J. Super. 530, 549 (App. Div. 2011), certif. denied, 213 N.J. 388 (2013).

Defendant was charged with conspiracy to commit murder.

> A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he: (1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or (2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.
>
> [N.J.S.A. 2C:5-2(a).]

In denying defendant's motion for a judgment of acquittal, the court held that a reasonable jury could find defendant guilty of conspiracy beyond a reasonable doubt based on trial testimony, particularly that of Z.J., who testified that she saw defendant on the evening of the murder, he appeared upset and had a secret conversation with Ragland, the alleged co-conspirator.

Evidence supported the State's claim that defendant sought to attain membership and a high position within the Bloods and had confessed to murder on numerous occasions. Evidence suggested

defendant murdered Skyers after Skyers was thought to have informed the police about Ragland's participation in the restaurant robbery. Ragland had the necessary authority to order an aspiring member of the Bloods to carry out a murder. J.V. testified defendant told her the Bloods had been debating about who was going to murder Skyers and defendant was the only one with the "balls" to do it. From the evidence presented at trial, the jury could have made a reasonable inference that defendant had conspired with Ragland to murder Skyers.

V

In Point V, defendant argues the court's decision to allow the jury unregulated access to two videotaped statements of defendant and one audiotaped statement of R.C., who recanted at trial, was erroneous. The court overruled defendant's objection, deciding the jury's unfettered access to the videotaped statements did not violate State v. Burr, 195 N.J. 119 (2008). Defendant argues that the court's decision did violate Burr and was prejudicial because the court could not ensure that the videotape was not unduly emphasized by the jury.

"The test of whether an error is harmless depends upon some degree of possibility that it led to an unjust verdict. The possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise

might not have reached." State v. Bankston, 63 N.J. 263, 273 (1973).

In Burr, the Court noted that

> allowing a jury unfettered access to videotaped witness statements could have much the same prejudicial effect as allowing a jury unrestricted access to videotaped testimony during deliberations. The danger posed is that the jury may unfairly emphasize [the child victim]'s videotaped statements over other testimony presented at trial, including her own cross-examination.
>
> [Burr, supra, 195 N.J. at 134.]

In Burr, a child's videotaped statement was introduced by the State under the "tender years" exception to the hearsay rule. Id. at 131; see also N.J.R.E. 803(c)(27). The court held that "any playback of the videotape must occur in open court." Id. at 135. This case did not involve child-sex-abuse, where the reliability of pretrial statements of children is particularly problematic. See State v. Michaels, 136 N.J. 299, 317 (1994).

The trial court determined that defendant's videotaped statements did not fall within Burr because defendant did not testify at trial. Thus, the videotapes could not take on a greater weight than the pertinent trial testimony, as in Burr. The tapes were not introduced by the State to challenge the veracity of, or to enhance trial testimony, and the tapes in fact contained an exculpatory explanation of defendant's out-of-court admissions.

20                                                      A-2490-14T2

R.C.'s audiotaped statement implicating defendant was inconsistent with her trial recantation, but because it was not visual, did not have the impact of her trial testimony or a videotape. The audiotape was also not the most significant evidence against defendant. Defendant's detailed admission to J.V. was much more compelling evidence of his guilt. See, e.g., State v. Morton, 155 N.J. 383, 416 (1998), cert. denied, 532 U.S. 931, 149 L. Ed. 2d 396, 121 S. Ct. 1380 (2001). Although the court's decision to allow the jury unfettered access to defendant's videotaped statements and R.C.'s audiotaped statement did not comport with the intent of Burr, the decision did not constitute harmful error given the plethora of evidence against defendant. See R. 2:10-2; State v. Weston, 222 N.J. 277, 300 (2015) (finding a lack of plain error in two trials where the court allowed the jury unfettered access to a videotaped statement). We perceive no other error in the trial and therefore reject defendant's Point VI, where he argues that cumulative error rendered the trial unfair.

## VI

The court sentenced defendant to an aggregate prison term of seventeen years with an 85% parole disqualifier pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. Defendant argues in Point VII that the trial court did not spend sufficient time

21                                              A-2490-14T2

explaining its reasons for finding mitigating and aggravating factors.

"Appellate courts review sentencing determinations in accordance with a deferential standard." State v. Fuentes, 217 N.J. 57, 70 (2014). We are bound to affirm a sentence

> even if [we] would have arrived at a different result, as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record. Assuming the trial court follows the sentencing guidelines, the one exception to that obligation occurs when a sentence shocks the judicial conscience.
>
> [State v. Cassady, 198 N.J. 165, 180 (2009) (quoting State v. O'Donnell, 117 N.J. 210, 215-16 (1989)).]

The court appropriately reviewed and balanced the aggravating and mitigating factors prior to imposing a sentence that does not shock the judicial conscience. We remand only to correct the judgment of conviction to reflect a conviction for illegal possession of a gun, N.J.S.A. 2C:39-5(b), rather than possession of a gun for an unlawful purpose, N.J.S.A. 2C:39-4(a). We do not retain jurisdiction.

Affirmed. Remanded only to correct the statutory reference in the judgment of conviction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2490-14T2