SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Mykal L. Derry** (A-13/14-21) (085795)

**Argued March 15, 2022 -- Decided June 8, 2022**

**SOLOMON, J., writing for a unanimous Court.**

The Court considers whether the State's murder indictment against defendants Mykal and Malik Derry should have been dismissed pursuant to N.J.S.A. 2C:1-3(f) after they were convicted in federal court of various drug offenses and for the discharge of a firearm. The Court also considers whether testimony defining slang terms by a witness who had not been qualified as an expert was properly admitted.

In 2010, a joint task force that included agents of the FBI, members of the Atlantic City Police Department and Atlantic County Prosecutor's Office, and representatives of other law enforcement agencies began investigating Mykal Derry, the leader of a drug organization, and his brother, Malik, among others. During the course of the investigation, a man was shot and killed in Atlantic City.

A federal grand jury indicted nineteen individuals involved with the Derry drug organization in the United States District Court for the District of New Jersey. Defendants were convicted of various drug offenses, as well as the discharge of a firearm during the commission of a drug trafficking crime. Following their federal convictions, the Atlantic County Prosecutor's Office indicted defendants, as relevant here, for murder and conspiracy to commit murder.

In federal court, defendants received a sentence enhancement that applies if a victim was killed under circumstances that would constitute murder. The federal prosecutor did not seek restitution because he was informed that New Jersey had charged defendants with murder and would seek restitution in state court. The District Court ultimately sentenced defendants to life without parole on the drug trafficking conviction; a concurrent term of four years on all other drug and conspiracy convictions; ten years on the discharge of a firearm conviction, to be served consecutively to the life sentence; and ten years' supervised release.

Defendants moved to dismiss their state-court indictment under N.J.S.A. 2C:1-3(f), arguing that the federal prosecution already captured the murder because the discharge of a firearm charge covered the shooting of the victim. They further

1

contended that the sentencing enhancement and resultant term of life-plus-ten-years adequately served New Jersey's interests such that dismissal was in the interest of justice. The trial court denied their motion.

Before trial, the State moved to admit, through the testimony of FBI Special Agent Christopher Kopp, several of defendants' statements intercepted during the investigation and from the federal proceedings. At trial, before Agent Kopp testified, defendants objected to Kopp's translation and interpretation of slang terms used by defendants and others, arguing that Kopp's testimony was expert testimony rather than lay opinion testimony. The trial court concluded that Kopp's interpretations constituted permissible lay opinion under N.J.R.E. 701. Through Kopp, the State admitted the conversations that took place on the night of the murder. The State also played surveillance videos of the shooting, offered testimony about physical evidence found -- including a gun found in the home of Mykal's girlfriend that was identified by a firearms expert and ballistics tests as the gun used in the murder -- and prior statements by Malik and Mykal, who each claimed to have committed the murder.

The court gave the model charge on expert evidence and identified three witnesses who offered expert opinions; Kopp, however, was not one of them. The jury returned the same day with unanimous verdicts of guilty of murder and conspiracy to commit murder as to both defendants.

The Appellate Division affirmed the denial of defendants' N.J.S.A. 2C:1-3(f) motion. The court found that Kopp's opinion should not have been offered as lay testimony but that the error in doing so was harmless. The court concluded that, based on his law enforcement experience and his familiarity with defendants' voices developed through the investigation, Kopp would have been qualified as an expert.

The Court granted certification. 248 N.J. 495 (2021); 248 N.J. 505 (2021).

**HELD:** Based on the differences between the federal and state proceedings, the trial court did not abuse its discretion in denying defendants' motion to dismiss the indictment. Like the Appellate Division, the Court finds that Special Agent Kopp's interpretations were expert rather than lay opinions, but that the error in admitting them as lay opinion testimony was harmless. The Court bases its finding of harmless error, however, upon the overwhelming evidence of defendants' guilt presented at trial, rather than on the hypothetical qualifications of the agent.

1. N.J.S.A. 2C:1-3(f) has three requirements for dismissal of an indictment. First, the defendant be prosecuted "for an offense based on the same conduct." Second, any action taken must be "in the interest of justice." Third, New Jersey's interest must be "adequately served" by the prior prosecution. (pp. 17-19)

2

2. The Court finds that N.J.S.A. 2C:1-3(f) applies here. N.J.S.A. 2C:1-11(a) is a mandatory bar to state prosecutions that follow federal prosecutions in specific circumstances not present here. N.J.S.A. 2C:1-3(f) is a discretionary bar that applies to any State prosecution based upon the same conduct as another jurisdiction's earlier prosecution. The mere fact that the two statutes overlap does not justify a different interpretation of otherwise plain language. And the Court finds that N.J.S.A. 2C:1-3(f) is not limited to situations where the defendant's prosecutions in New Jersey and the other jurisdiction are conducted contemporaneously. Such an interpretation would allow a court to dismiss an indictment with prejudice without knowing the result of the other jurisdiction's prosecution, which would frustrate N.J.S.A. 2C:1-3(f)'s intended purpose. (pp. 20-23)

3. In considering whether the federal life-plus-ten-years sentence, without the possibility of parole, adequately serves the State's interests such that dismissal of defendants' indictment is in the interest of justice, the Court recognizes that murder is the most heinous and vile offense proscribed by criminal laws. The federal proceeding did not culminate in a jury finding that defendants had in fact committed murder. This distinction sufficiently distinguishes the State's interest in prosecuting defendants for murder from the United States' interest in prosecuting them for their drug crimes. Although the life-without-parole sentences imposed on defendants are the second most severe penalty permitted by law, New Jersey's Crime Victim's Bill of Rights requires that New Jersey's victim-focused provisions -- including the involvement of the victim's family -- be vindicated by the federal prosecution, which is not the case here. Accordingly, the trial court did not abuse its discretion in denying defendants' motion to dismiss the indictment. (pp. 23-25)

4. The Court has permitted law enforcement officials to offer lay opinions under N.J.R.E. 701 when testimony was based on, and supported by testimony about, the officer's personal perception and observation. A question that requires a witness to use his training and experience to testify about his belief as to what had happened, on the other hand, strongly suggests that the question calls for an expert opinion, governed by N.J.R.E. 702. The Court reviews case law and other guidance about the qualification of an officer's testimony as expert testimony, as well as precautions that must be taken to avoid undue prejudice from such testimony, including disclosure requirements and the issuance of an expert jury instruction. The Court notes that the erroneous failure to qualify an expert may nevertheless still be considered harmless error. (pp. 26-29)

5. Here, the Court finds that Kopp's testimony should have been considered as expert testimony but that the failure to do so was harmless. Kopp's testimony here presents the hallmarks of expert evidence. It purports to define and explain slang terms that are beyond the ken of an average juror, even if some of the terms' definitions are clear from context. Many decisions from the federal courts and other

3

states recognize the importance of expert testimony in circumstances such as these. Kopp's testimony should therefore have been considered under N.J.R.E. 702, which would have triggered the disclosure requirements in New Jersey's Court Rules and required an expert jury instruction on Kopp's testimony.  R. 3:13-3(b)(1)(I). Nevertheless, like the Appellate Division, the Court concludes that the error in admitting Kopp's testimony under N.J.R.E. 701 was harmless, but for a different reason -- the overwhelming evidence against defendants, which included Kopp's fact testimony, the conversations from the night of the murder, testimony from other law enforcement witnesses that the firearm used in the shooting was found at Mykal's girlfriend's house, and defendants' own admissions.  (pp. 29-33)

**AFFIRMED AS MODIFIED.**

**CHIEF JUSTICE RABNER; JUSTICES ALBIN and PATTERSON; and JUDGE FUENTES (temporarily assigned) join in JUSTICE SOLOMON's opinion.  JUSTICE PIERRE-LOUIS did not participate.**

SUPREME COURT OF NEW JERSEY

A-13/14 September Term 2021

085795

State of New Jersey,

Plaintiff-Respondent,

v.

Mykal L. Derry, a/k/a
Mykac Derry, Mykel
Derry, and Stevens
Mykel,

Defendant-Appellant.

State of New Jersey,

Plaintiff-Respondent,

v.

Malik Derry, a/k/a
Malik F. Derry, and
Mykell Watson,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|--------|---------|
| March 15, 2022 | June 8, 2022 |

1

Lauren S. Michaels, Assistant Deputy Public Defender, argued the cause for appellant Mykal L. Derry (Joseph E. Krakora, Public Defender, attorney; Lauren S. Michaels, of counsel and on the briefs, and Frank M. Gennaro, Designated Counsel, on the briefs).

Stephen W. Kirsch, Designated Counsel, argued the cause for appellant Malik Derry (Joseph E. Krakora, Public Defender, attorney; Stephen W. Kirsch, on the briefs).

Daniel A. Finkelstein, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Acting Attorney General, attorney; Daniel A. Finkelstein, of counsel and on the briefs).

David White argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; David White and Joshua P. Law, on the brief).

JUSTICE SOLOMON delivered the opinion of the Court.

This appeal requires us to assess two issues arising from the State's prosecution of defendants Mykal and Malik Derry for murder and other offenses after they were convicted in the United States District Court for the District of New Jersey for various drug offenses and for the discharge of a firearm during the commission of those offenses. Both the federal and the state prosecutions stemmed from a cooperative investigation into defendants' drug trafficking activities in Atlantic County.

2

We first address the effect of N.J.S.A. 2C:1-3(f) on this prosecution. That statute provides a court with the discretion to dismiss an indictment if it finds that another jurisdiction prosecuted the defendant for the same conduct, the result of that prosecution adequately served New Jersey's interests, and dismissal of the indictment is in the interest of justice. Here, the State indicted defendants for what appears to be a drug-related murder after their convictions for drug trafficking and other offenses.

We next address an evidentiary issue. During defendants' federal trial, the federal agent who led the investigation testified about his interpretations of slang terms used by defendants and their coconspirators in intercepted telephone communications. The agent testified in the state trial against defendants. The Law Division admitted the agent's interpretations as lay opinion testimony under N.J.R.E. 701. On appeal, the Appellate Division concluded that the interpretations should have been admitted as expert opinion testimony under N.J.R.E. 702, but that the trial court's failure to do so was harmless because the agent would have qualified as an expert based on the trial record.

We affirm the judgment of the Appellate Division on both issues with modification. Based on the differences between the federal and state proceedings, we conclude that the trial court did not abuse its discretion in

3

denying defendants' motion to dismiss the indictment. We also agree with the Appellate Division that the agent's interpretations were expert rather than lay opinions, but that the error in admitting them as lay opinion testimony was harmless. We base our finding of harmless error, however, upon the overwhelming evidence of defendants' guilt presented at trial rather than the hypothetical qualifications of the agent.

I.

We derive the following facts from the record of defendants' trial and pretrial motions made in the Law Division and from the relevant federal proceedings.

In 2010, a joint task force that included agents of the FBI, members of the Atlantic City Police Department and Atlantic County Prosecutor's Office, and representatives of other law enforcement agencies began an investigation into a narcotics operation in the Stanley Homes Villages in Atlantic City. Led by FBI Special Agent Christopher Kopp, the investigation targeted defendant Mykal Derry, the leader of the drug organization, and his brother, Malik, among others.[1]

During the course of the investigation, a man named Tyquinn "T.Y." James, a member of a drug trafficking organization that had clashed with

---

[1] Because defendants are brothers, we use their first names to avoid confusion.

4

defendants' organization in the past, was shot and killed in front of two businesses in Atlantic City. Surveillance footage from both businesses captured James standing outside of the two establishments when an unidentified man wearing a hood and mask rode up on a bicycle and shot James three times.

A court-approved wiretap intercepted calls and text messages among defendants and their coconspirators. The intercepted exchanges included veiled references to the shooting of James.

A grand jury indicted nineteen individuals involved with the Derry drug organization in the United States District Court for the District of New Jersey. Following their trial before the Honorable Noel L. Hillman, U.S.D.J., defendants were convicted of various drug offenses, as well as the discharge of a firearm during the commission of a drug trafficking crime under 18 U.S.C. § 924(c). Following their federal convictions, the Atlantic County Prosecutor's Office indicted defendants for James' murder under N.J.S.A. 2C:11-3(a)(1) (first degree murder) and 2C:5-2 (conspiracy to commit murder), along with several other offenses that were later dismissed.

During the federal sentencing hearing, Judge Hillman enhanced defendants' sentences on the drug trafficking offense to life in prison, citing a

cross-reference in United States Sentencing Guideline 2D1.1(d), which states that

> [i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111[2] had such killing taken place within the . . . jurisdiction of the United States, apply [Guideline] 2A1.1 (First Degree Murder) or 2A1.2 (Second Degree Murder), as appropriate, if the resulting offense level is greater than that determined under this Guideline.

Relying on interrogatories put before and answered by the jury -- "that Malik Derry discharged a weapon in furtherance of a drug trafficking conspiracy," and that "the only evidence in this case that Malik Derry discharged a weapon is the evidence presented by the Government regarding the shooting of Tyquinn James" -- the court found the cross reference to be applicable by a preponderance of the evidence.

At sentencing, the court noted that the United States was not seeking restitution. The federal prosecutor explained that he did not seek restitution because he was informed that New Jersey had charged defendants with James'

---

2  18 U.S.C. § 1111(a) defines murder as "the unlawful killing of a human being with malice aforethought"; provides a list of circumstances that constitute first-degree murder, including "[e]very murder perpetrated by . . . lying in wait, or any other kind of willful deliberate malicious, and premeditated killing"; and provides that all other murders are second-degree. 18 U.S.C. § 1111(b) provides that first-degree murder is punishable by life imprisonment or death and that second-degree murder is punishable by "any term of years or for life." Under the cross-reference, defendants' base offense level was 43, indicating a minimum sentence of life without parole.

murder and would seek restitution in state court.  The District Court ultimately sentenced defendants to life without parole on the drug trafficking conviction;[3] four years on all other drug and conspiracy convictions, to be served concurrently with the life sentence; ten years on the 18 U.S.C. § 924(c) conviction, to be served consecutively to the life sentence; and ten years' supervised release.  Both defendants' convictions and sentences were affirmed on appeal, and the United States Supreme Court denied Malik's petition for certiorari.

## II.

## A.

Defendants moved to dismiss their state-court indictment under 2C:1-3(f),[4] arguing that the federal prosecution already captured James' murder because the § 924(c) charge covered the shooting of the victim.  They further contended that the sentencing enhancement and resultant term of life-plus-ten-

---

[3]  Both defendants were convicted under 21 U.S.C. §§ 841, 846, and 860, as well as under 18 U.S.C. § 924(c).  Mykal was also convicted under 21 U.S.C. § 856.  Defendants' 21 U.S.C. § 841 convictions carried a maximum sentence of life-in-prison.

[4]  Defendants originally also moved for dismissal under N.J.S.A. 2C:1-11(a), which, under certain circumstances, mandatorily bars the State from prosecuting defendants after a federal prosecution.  Before this Court, defendants have conceded that N.J.S.A. 2C:1-11(a) does not bar the State's murder prosecution.

years adequately served New Jersey's interests such that dismissal was in the interest of justice.

The trial court denied defendants' motion, concluding that the federal proceeding did not culminate in a jury finding that defendants had in fact murdered James. In the court's view, that sufficiently distinguished the State's interest in prosecuting defendants for murder from the United States' interest in prosecuting them for their drug crimes.

### B.

Before trial, the State moved to admit, through the testimony of Agent Kopp, several of defendants' statements intercepted during the wiretap investigation and from the federal proceedings. The court held an N.J.R.E. 104(c) hearing to determine whether the recorded conversations between defendants and their alleged coconspirators were admissible under N.J.R.E. 803(b)(5). At the hearing, Agent Kopp explained how the wiretap functioned and how he was able to verify defendants' voices using recordings of calls made by defendants from jail. Kopp also explained that he became familiar with the slang that defendants and their coconspirators used in their conversations through his experience leading the investigation, and by corroborating and cross-referencing the wiretap intercepts from approximately

8

7,000 calls and numerous text messages with real-time surveillance conducted by law enforcement agents in the field.

Using his interpretations of the slang that defendants and their coconspirators used, Kopp discussed a series of conversations occurring throughout the night of James' shooting, offering translations of some terms. For instance, a call was played for the jury in which Mykal said to his confederate that "Lik [had] splashed T.Y." Kopp testified that the statement indicated Malik "just did something" to Tyquinn James.

On cross-examination by defense counsel, Kopp explained how he learned the meanings of several terms by contextualizing them with events and actions taken by defendants and their coconspirators, as well as through repeated use of the terms by defendants and their coconspirators. Ultimately, the trial court admitted defendants' wiretap conversations but, to reduce the prejudicial effect of the testimony, required the parties to characterize the federal investigation as an unrelated investigation without mentioning that defendants were targets.

At trial, before Agent Kopp testified, defendants objected to Kopp's translation and interpretation of slang terms used by defendants and others, arguing that Kopp's testimony was expert testimony rather than lay opinion testimony. The trial court concluded that Kopp's interpretations constituted

9

permissible lay opinion under N.J.R.E. 701 because they were "based upon his acquaintance and knowledge with the parties and how they spoke."

Kopp explained that the more he listened to the wiretap, the more familiar he became with the speakers' voices, including defendants, and the slang and code words the speakers used, also explaining that he had listened to approximately 7,000 calls during six months of the investigation. Through Kopp, the State admitted the conversations that took place on the night of the murder. The first call played was between Mykal and Malik before the shooting. Kopp interpreted slang terms indicating that Malik informed Mykal that James was near the two businesses.

Later, text messages and phone calls between Mykal and other coconspirators were admitted. Kopp translated several slang terms in these conversations that indicated that Malik had shot and killed someone. In the next conversation, Malik said that he was "in the trap," which Kopp explained was one of the places the Derrys "hung out at." Kopp also explained that an apartment at 307 N. MLK Boulevard was one of those locations, was five or six blocks from the crime scene, and that a black bicycle was recovered at the apartment. In the next conversation, Kopp translated more terms that indicated that defendants and their coconspirators were aware that the police were investigating James' homicide.

10

Aside from Kopp's testimony, the State played the surveillance videos of the shooting and called as a witness a detective from the Atlantic City Prosecutor's Office Forensic Crime Scene Unit who explained that a bicycle and spent shells were collected from the scene of the shooting and the search of 307 N. MLK Boulevard. Another officer explained that a firearm and a letter addressed to Mykal was found in his girlfriend's home. A firearms expert performed ballistics tests and identified that gun as the one used to kill James.

Lastly, the court admitted defendants' testimony from two prior proceedings in federal court. In the first statement, Malik claimed full responsibility for the murder and alleged that Mykal was not involved. In the second, Mykal confirmed that the voices on the wiretap were defendants' and explained that he had killed James over a dispute about a woman but told others that Malik killed James to strengthen Malik's reputation for toughness. Mykal further stated that his messages alluding to Malik's commission of the murder were lies.

The court gave the model charge on expert evidence and identified three witnesses who offered expert opinions; Kopp, however, was not one of them. The jury returned the same day with unanimous verdicts of guilty of murder and conspiracy to commit murder as to both defendants.

At sentencing, the court found that aggravating factors three, defendants' risk of re-offense; six, defendants' prior criminal record; and nine, the need for deterrence, applied to both defendants. See N.J.S.A. 2C:44-1(3), (6), and (9). The court found that no mitigating factors applied, and it ultimately sentenced defendants to prison terms of fifty years, subject to NERA, to be served concurrently with their federal sentences. The court also imposed joint and several orders of restitution for both defendants based on the State's proofs, although it acknowledged that "collectability [was] certainly an issue."

## C.

Both defendants appealed their convictions. In an unpublished opinion, the Appellate Division affirmed in part and reversed in part the judgment of the trial court.

Relevant to this appeal, the court affirmed the trial court's denial of defendants' N.J.S.A. 2C:1-3(f) motion, finding defendants' argument "must fail" because "[d]efendants were not prosecuted [federally] for the killing" of James and "[t]hus, they would suffer no unfairness from 'multiple prosecutions.'"

As to the issue of Kopp's lay opinion testimony, the Appellate Division contrasted such testimony on the meaning of slang from a law enforcement witness who participated in the conversation with the testimony of one who

12

relied on his "training and experience and knowledge of [an] investigation," finding the latter "is more accurately characterized as an expert opinion." Noting that Kopp's interpretations were "based on his training, experience and knowledge of the underlying investigation [and] not his participation in the conversations," the court concluded that "his opinion should have been offered as expert opinion testimony."

The Appellate Division then applied a harmless error analysis, concluding that Kopp would have qualified as an expert based on his law enforcement experience and his familiarity with defendants' voices developed through the investigation, noting that "he testified that his understanding of the terms used was based on his experience." The court accordingly held that the trial court's error in admitting Kopp's interpretations as lay opinions was harmless.

We granted defendants' petitions for certification, "limited to defendants' challenge to (1) the denial of the motion to dismiss based on defendants' sentencing in a preceding federal case, and (2) the admission of testimony by a witness defining slang terms without the witness having been qualified as an expert." 248 N.J. 495 (2021); 248 N.J. 505 (2021). We granted the Association of Criminal Defense Lawyers (ACDL) leave to participate as amicus curiae.

13

III.

A.

Defendants argue that the trial court abused its discretion in failing to dismiss the indictment under N.J.S.A. 2C:1-3(f). Defendants contend that the federal prosecution, which resulted in a life-plus-ten-years sentence enhanced by the District Court because defendants caused James' death, more than adequately served New Jersey's interest. They aver that the State cannot punish defendants any more than the United States already has, as illustrated by the concurrent state sentences they received. Thus, in defendants' view, dismissal would be in the interest of justice.

As to the admission of Kopp's testimony, defendants agree with the Appellate Division that the trial court erred in admitting the testimony under N.J.R.E. 701 because Kopp's translations constituted expert opinion testimony. However, defendants dispute the Appellate Division's conclusion that the error was harmless, challenging whether Kopp would have qualified as an expert under N.J.R.E. 702. Defendants argue that Kopp's testimony failed to explain his area of expertise or the methodology he used to reach his conclusions -- information that they contend was critical to the jury's evaluation of Kopp's opinions. They also point to the absence here of the procedural protections prescribed by Rule 3:13-3(b)(1)(I) -- prior notice of expert testimony, the

14

expert's qualifications, and the expert's opinions and the bases for those opinions -- as well as the absence of an expert jury charge specific to Kopp's testimony. Defendants submit that Kopp's erroneously admitted testimony was the centerpiece of the State's case and served to connect all of the evidence against them, thereby depriving them of a fair trial.

Amicus ACDL echoes all of defendants' arguments on both issues, claiming that allowing the State to essentially relitigate the completed federal proceeding is an inefficient use of prosecutorial and judicial resources. As to Kopp's testimony, amicus asserts that Kopp's translations were impermissible opinions on defendants' guilt.

B.

The State first argues that N.J.S.A. 2C:1-3(f) does not apply to its prosecution of defendants for murder because N.J.S.A. 2C:1-11(a) controls in situations where the United States, rather than a sister state, prosecutes a defendant before New Jersey does.

However, should the statute apply to a federal prosecution, the State contends that the tense of N.J.S.A. 2C:1-3(f), namely the part of the statute that explains that a New Jersey court may dismiss a prosecution "because the defendant is being prosecuted . . . in another jurisdiction," means that the statute does not apply to defendants because the United States obtained

15

defendants' convictions before the State indicted them for murder. Put differently, the State contends that defendants were not "being prosecuted" by the United States when the State indicted them.

Lastly, the State argues that, assuming the statute applies in full to defendants, the prior federal prosecution did not serve New Jersey's interests. The State asserts its sovereign interest in prosecuting offenses against its laws, and that homicide offenses present a unique harm that justifies its murder prosecution of defendants. The State claims that the federal proceeding did not culminate in a jury finding beyond a reasonable doubt that defendants killed James, and that the State had a duty to James' family to seek justice for his death.

As to Kopp's testimony, the State first asserts that his testimony was proper under N.J.R.E. 701 because Kopp's translations were based on his hearing defendants' recorded conversations, and N.J.R.E. 701's perception requirement does not necessitate that the perception be firsthand and in real-time. The State cites federal cases that allowed similar testimony as lay opinion testimony.

Assuming that admission of Kopp's testimony under N.J.R.E. 701 was in error, the State agrees with the Appellate Division's conclusion that that the error was harmless. In addition to arguing that the record contains enough

16

information to qualify Kopp as an expert, the State calls attention to what it alleges is overwhelming evidence of defendants' guilt independent of Kopp's translations and interpretations.

IV.

A.

We first address defendants' motion to dismiss the indictment under N.J.S.A. 2C:1-3(f). This Court "generally review[s] a trial court's decision to dismiss an indictment under the deferential abuse of discretion standard," but "[w]hen the decision to dismiss relies on a purely legal question," such as the interpretation of a statute, the Court "review[s] that determination de novo." State v. Twiggs, 233 N.J. 513, 532 (2018).

The statute relied upon by the trial court here, N.J.S.A. 2C:1-3(f), provides that

> [n]otwithstanding that territorial jurisdiction may be found under this section, the court may dismiss, hold in abeyance for up to six months, or, with the permission of the defendant, place on the inactive list a criminal prosecution under the law of this State where it appears that such action is in the interests of justice because the defendant is being prosecuted for an offense based on the same conduct in another jurisdiction and this State's interest will be adequately served by a prosecution in the other jurisdiction.

"N.J.S.A. 2C:1-3(f) represents a curtailment of the dual sovereignty doctrine," which permits two sovereigns to prosecute the same defendant for

17

the same offense because each offense is a violation of each sovereign's law. State v. Gruber, 362 N.J. Super. 519, 528-29 (App. Div. 2003). Subsection (f) is "a unique provision granting discretion to the court to dismiss [an indictment] or take some lesser action." 2 The New Jersey Penal Code: Final Report 5 (Crim. L. Revision Comm'n 1971). The Commission believed that N.J.S.A. 2C:1-3 "somewhat broaden[ed] New Jersey's criminal jurisdiction" and thus included subsection (f) to "adequately protect against multiple prosecutions while, at the same time, granting a broad power to the State to prosecute where appropriate." Ibid. "N.J.S.A. 2C:1-3(f) may also be viewed as promoting efficiency, uniformity, and consistency in the administration of the criminal justice system." See Gruber, 362 N.J. Super. at 528.

Essentially, N.J.S.A. 2C:1-3(f) has three requirements for dismissal of an indictment. First, the New Jersey prosecution must be "based on the same conduct" as the other jurisdiction's prosecution. Thus, the statute "requires as a precondition to dismissal" that the defendant be prosecuted "'for an offense based on the same conduct.' It does not demand substantially identical charges" based on a "comparison both of the offenses charged in each state and their factual underpinnings." Id. at 532-33; accord State v. Ellis, 280 N.J. Super. 533, 551 (App. Div. 1995). Second, any action taken under N.J.S.A. 2C:1-3(f) must be "in the interest of justice." Third, New Jersey's interest

18

must be "adequately served" by the prior prosecution. Only two reported cases have addressed the statute. See id. at 529 (citing Ellis, 280 N.J. Super. at 533). Both are informative.

In Ellis, 280 N.J. Super. at 538, the State sought to prosecute the defendant for first-degree kidnapping after New York had convicted the defendant of second-degree kidnapping. In permitting New Jersey's prosecution of the defendant, the court found that the defendant's New Jersey conviction relied on the victim's confinement in New Jersey, while the New York conviction was based upon different conduct -- the victim's abduction in New York. Id. at 551.

In Gruber, 362 N.J. Super. at 522, New Jersey sought to prosecute a defendant for second-degree and fourth-degree child endangerment for the possession and distribution of child pornography, after New York convicted the defendant of promoting an obscene sexual performance by a child in that state, for which he was sentenced to five years' probation. The Gruber court relied on the differences between the conduct prohibited in New York and New Jersey and observed that our state's Code of Criminal Justice provided for more serious punishment of the relevant conduct. See id. at 535-36. The court recognized that "[i]t is New Jersey's right, as a sovereign co-equal to New York, to treat the crime of distributing child pornography as a more

19

serious offense than does New York," and it concluded that the "ideological difference" between the two States' approaches "form[ed] a legitimate basis for a prosecution of [the defendant] in New Jersey, in addition to New York." Id. at 536.

B.

1.

In determining whether N.J.S.A. 2C:1-3(f) applies here -- a New Jersey murder prosecution following a federal conviction for drug and firearm offenses -- we begin with its language.

N.J.S.A. 2C:1-3(f) allows a court to dismiss a prosecution if "the defendant is being prosecuted for an offense based on the same conduct in another jurisdiction." (emphasis added). The statutory language does not differentiate between whether the other prosecuting jurisdiction is the United States or a sister state. On its face, therefore, there is no reason why N.J.S.A. 2C:1-3(f) would not apply here.

In arguing that N.J.S.A. 2C:1-3(f) cannot apply to its prosecution of defendants, the State first contends that N.J.S.A. 2C:1-11(a) controls this situation to the exclusion of N.J.S.A. 2C:1-3(f). We find this assertion inconsistent with the statutes' language. N.J.S.A. 2C:1-11(a) is a mandatory bar to state prosecutions that follow federal prosecutions in specific

20

circumstances not present here. N.J.S.A. 2C:1-3(f) is a discretionary bar that applies to any State prosecution based upon the same conduct as another jurisdiction's earlier prospection. By their language, both statutes apply to this prosecution, although defendants concede that N.J.S.A. 2C:1-11(a) does not bar the murder prosecution. The mere fact that the two statutes overlap does not justify a different interpretation of otherwise plain language. See State v. Lopez-Carrera, 245 N.J. 596, 613 (2021) ("If the language of a statute is clear, a court's task is complete."). We thus reject the argument that the more specific statute, N.J.S.A. 2C:1-11(a), controls to the exclusion of N.J.S.A. 2C:1-3(f).

Second, the State points to the tense of the same part of the statute, arguing that because N.J.S.A. 2C:1-3(f) is limited to situations where "the defendant is being prosecuted for an offense based on the same conduct in another jurisdiction," it does not apply to the federal prosecution of defendants, which had already resulted in a conviction[5] before the State indicted them. Put differently, at the time the State began its prosecution of defendants, they were not "being prosecuted" by the United States. Although

---

[5] The record is silent as to the exact date of defendants' convictions, but it appears that the State indicted them after their federal convictions but before they were sentenced by the District Court on those convictions.

21

the tense does suggest contemporaneity, we cannot agree with the State's literal interpretation.

Rather, we conclude that <u>Gruber</u> and <u>Ellis</u> correctly applied the statute. In both those cases, although the courts did not analyze the timing of the respective prosecutions, the State indicted the defendants after New York had obtained convictions of each defendant. <u>See</u> <u>Gruber</u>, 362 N.J. Super. at 524; <u>Ellis</u>, 280 N.J. Super. at 538.

We find that interpretation must be correct because N.J.S.A. 2C:1-3(f) grants a court the discretion to "dismiss, hold in abeyance for up to six months, or, with the permission of the defendant, place on the inactive list a criminal prosecution." Ostensibly, the statute allows a court to dismiss an indictment with or without prejudice -- the language does not suggest any limitation on the nature of the dismissal. Thus, under the State's interpretation, a court would only have the power to dismiss under N.J.S.A. 2C:1-3(f) while the prosecution in another jurisdiction is still pending. In other words, the State's reading of the statute would allow a court to dismiss an indictment with prejudice without knowing the result of the other jurisdiction's prosecution.

We think it illogical that the Legislature would empower a court to terminate the State's opportunity to prosecute a defendant while there was a chance that the prior prosecution could result in an acquittal, or a sentence

much lower than what our Code would provide for, or reversal on appeal. That would frustrate N.J.S.A. 2C:1-3(f)'s intended purpose -- to "adequately protect against multiple prosecutions while, at the same time, granting a broad power to the State to prosecute where appropriate." Crim. L. Revision Comm'n, at 5. We do not interpret statutes to allow "a result completely at odds with the overall statutory scheme." State v. Crawley, 187 N.J. 440, 452 (2006). Accordingly, we next determine whether the federal prosecution adequately served the State's interests.

2.

We begin our analysis of whether the federal prosecution served New Jersey's interests by emphasizing the discretion granted to the trial court by N.J.S.A. 2C:1-3(f) to dismiss or take some lesser action, see Crim. L. Revision Comm'n, at 5, and the deferential standard that we apply to denials of motions to dismiss indictments, see Twiggs, 233 N.J. at 532. Here, we apply those standards to determine whether the federal life-plus-ten-years sentence, without the possibility of parole, adequately serves the State's interests such that dismissal of defendants' indictment is in the interest of justice.

We recognize that murder, the offense the State seeks to prosecute defendants for, "is the most heinous and vile offense proscribed by our criminal laws." State v. Serrone, 95 N.J. 23, 27 (1983); accord State v. Comer,

23

249 N.J. 359, 397 (2022). In <u>Serrone</u>, we observed that "[i]n dealing with this particularly egregious offense, great deference must be given to the legislative intent governing sentencing." 95 N.J. at 27. Like the Legislature, "[h]istorically, a prosecutor has been vested with broad discretionary powers to be exercised in the conscientious discharge of the manifold responsibilities of his office," <u>State v. McCrary</u>, 97 N.J. 132, 142 (1984), which include seeking justice for victims and ensuring the public's safety, <u>see</u> <u>N.J. Const.</u> art. I, ¶ 22; N.J.S.A. 52:4B-36. We afford the prosecutor's decision here commensurate deference.

We agree with the trial court and Appellate that the federal proceeding did not culminate in a jury finding that defendants had in fact murdered James. This distinction sufficiently distinguishes the State's interest in prosecuting defendants for murder from the United States' interest in prosecuting them for their drug crimes. We emphasize that the district court's decision to impose a cross-reference enhancing defendants' sentences is not equivalent to the jury's verdict finding them guilty of murder in the first degree.

Although the life-without-parole sentences imposed on defendants are "the second most severe penalty permitted by law," <u>State v. Zuber</u>, 227 N.J. 422, 442 (2017) (quoting <u>Graham v. Florida</u>, 560 U.S. 48, 69 (2010)), our Crime Victim's Bill of Rights, N.J.S.A. 52:4B-34 to -38, requires us to ensure

24

that our victim-focused provisions -- including involvement of the victim's family -- were vindicated by the federal prosecution. Here, for example, it appears that James's family was present at the state proceedings, but -- although the federal record is unclear on this point -- there is no suggestion that his family attended the federal sentencing proceeding. Thus, although the question is close, here the factors on balance tip in favor of finding that the federal prosecution did not adequately serve the State's interests.

Accordingly, we conclude that the trial court did not abuse its discretion in denying defendants' motion to dismiss the indictment. Because failure to satisfy any element of the statute indicates that dismissal of the indictment is not the appropriate result, we need not reach the question of whether the two prosecutions were "based on the same conduct," as N.J.S.A. 2C:1-3(f) requires.

V.

A.

Turning to the evidentiary issue presented by this appeal, opinion testimony by lay witnesses is governed by N.J.R.E. 701, which provides that "[i]f a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it: (a) is rationally based on the

25

witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue."

We have permitted law enforcement officials to offer lay opinions in certain circumstances when "the lay opinion testimony was based on, and supported by testimony about, the officer's personal perception and observation." State v. McLean, 205 N.J. 438, 459 (2011); accord State v. Hyman, 451 N.J. Super. 429, 442-49 (App. Div. 2017). Thus, a question that requires a witness to use "his training and experience" to "testify about his belief as to what had happened," strongly suggests that the question calls for an expert opinion, governed by N.J.R.E. 702. McLean, 205 N.J. at 462.

N.J.R.E. 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." N.J.R.E. 702

> sets forth three basic requirements for the admission of expert testimony: (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [State v. Torres, 183 N.J. 554, 567-68 (2005) (quoting State v. Berry, 140 N.J. 280, 290 (1995)).]

26

To illustrate, in Torres, we approved the admission of an officer's expert testimony on the organization and structure of Latin street gangs because his testimony met the three requirements of N.J.R.E. 702. See id. at 579. The testimony was beyond the ken of an average juror because "a juror generally would not be expected to be familiar with the structure and organizational aspects of gangs or the significance of particular gang symbols." Id. at 573. As to reliability, "[b]ased on the numerous judicial decisions from other jurisdictions that have recognized the appropriateness of admitting certain gang-related expert testimony, . . . . [w]e conclude[d] that the expert gang-related evidence . . . was sufficiently reliable to satisfy the second requirement for its admissibility." Id. at 574. And lastly, the detective in Torres qualified as an expert based on his experience, which included "tracking and assessing new gang trends, instructing and lecturing on gang alliance and suppression techniques, and handling investigations primarily for Hispanic groups and organizations involved in combating street gangs." Id. at 574-75.

With respect to translation testimony from law enforcement agents, the 1972 Advisory Committee Notes to Federal Rule of Evidence 702, which our own N.J.R.E. 702 mirrors, specifically provide that

> when a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such

27

transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.

But testimony from law enforcement agents is not without limitation, regardless of the form in which the officer testifies. In <u>Torres</u>, we observed that "when the expert witness is an investigating officer, the expert opinion may present significant danger of undue prejudice because the qualification of the officer as an expert may lend credibility to the officer's fact testimony regarding the investigation." <u>Torres</u>, 183 N.J. at 580. We have cautioned trial courts confronted with such overlapping testimony "to carefully weigh the testimony and determine whether it may be unduly prejudicial. Trial courts have discretion and should exercise it, where appropriate, to limit the scope of such testimony." <u>Ibid.</u>

Additionally, we have advised trial courts to "give a limiting instruction to the jury 'that conveys to the jury its absolute prerogative to reject both the expert's opinion and the version of the facts consistent with that opinion.'" <u>Ibid.</u> (quoting <u>Berry</u>, 140 N.J. at 304). And as defendants note, our Court Rules require certain disclosures when a party seeks to use expert opinion testimony at trial. <u>See Rule</u> 3:13-3(b)(1)(I).

28

That said, the erroneous failure to qualify an expert may still be considered harmless error. See, e.g., Hyman, 451 N.J. Super. at 456-59, 456 n.10 (finding error harmless because detective was qualified and trial court gave "hybrid instruction regarding [the detective's] testimony, which largely mirrored model jury charge for experts").

## B.

As to the evidentiary issue before us, we conclude, like the Appellate Division, that Kopp's testimony should have been considered as expert testimony but that the failure to do so was harmless -- albeit for a different reason. To reach this conclusion, we need not assess whether Kopp would have qualified as an expert under N.J.R.E. 702. Indeed, the record does not clearly explain his area of expertise or the methodology he used to reach his conclusions. Furthermore, admission of Kopp's testimony under N.J.R.E. 702 would violate the disclosure requirements of Rule 3:13(b)(1)(I). Instead, we rely on the overwhelming evidence against defendants to conclude that the error in admitting Kopp's testimony as lay opinion testimony was harmless.

## 1.

As to the character of Kopp's testimony, we first review the Appellate Division opinion in Hyman, where the court considered whether a detective's translation testimony was expert or lay opinion, and concluded that it was

29

expert testimony because the detective "was asked repeatedly to render opinions based on 'his training and experience and knowledge of this investigation.'" 451 N.J. Super. at 448. The court observed that the detective's testimony at both an N.J.R.E. 104(c) hearing and at trial did not "connect his 'knowledge of [the] investigation' and his interpretation of the slang and code words" and added that "[t]here [wa]s no evidence that [the detective] was undercover, or had conversed with [the] defendant or other conspirators when the arcane terms were used." Id. at 449.

Citing to federal cases, the court reasoned that an officer who participated in the conversation could offer lay opinion testimony, but an officer who was not a participant and instead relied on experience, training, or other knowledge obtained during the investigation must be qualified as an expert under the relevant rules of evidence and procedure. See id. at 451.

Like in Hyman, Kopp's testimony here presents the hallmarks of expert evidence. It purports to define and explain slang terms that are beyond the ken of an average juror, even if some of the terms' definitions are clear from context. Many decisions from the federal courts and other states recognize the importance of expert testimony in circumstances such as these. See, e.g., United States v. Smith, 640 F.3d 358, 365 (D.C. Cir. 2011); United States v. Griffith, 118 F.3d 318, 322 (5th Cir. 1997); United States v. Delpit, 94 F.3d

30

1134, 1145 (8th Cir. 1996).  And Kopp's testimony was undoubtedly based on his training, experience, and supervision of the investigation, and not solely on his listening to the calls and reading the messages.  Indeed, Kopp explained that other officers participating in the investigation performed physical surveillance, reports of which he viewed and relied upon in his own investigative work.

Accordingly, we hold that Kopp's testimony should have been considered under N.J.R.E. 702, which would have triggered the disclosure requirements in our Court Rules and required an expert jury instruction on Kopp's testimony.  R. 3:13-3(b)(1)(I).

2.

Nevertheless, like the Appellate Division, we also conclude that the error in admitting Kopp's testimony under N.J.R.E. 701 was harmless, but for a different reason -- the overwhelming evidence against defendants.  In light of that evidence, we need not consider whether Kopp would have qualified as an expert regardless of the trial court's ruling that his testimony was a lay opinion.

Notably, the trial court in Hyman gave a "hybrid" jury instruction that resembled our Model Jury Charge on expert opinion testimony in many respects.  451 N.J. Super. at 456-57, 456 n.10.  That instruction remedied at

least some of the prejudice the defendant faced in having the detective's testimony erroneously admitted as lay opinion testimony. See Mogull v. CB Com. Real Est. Grp., Inc., 162 N.J. 449, 466 (2000). No such instruction was given in this case. See State v. Green, 86 N.J. 281, 287 (1981) ("Appropriate and proper charges to a jury are essential for a fair trial.").

Even so, Kopp's fact testimony regarding the investigation, and not the recorded communications among the coconspirators, served to connect many of the other pieces of evidence by identifying key terms and locations referred to in defendants' phone calls and text messages. That evidence, some of which independently confirmed Kopp's interpretations, was sufficiently incriminating that, even without Kopp's interpretations, the result would have been the same.

As an initial proposition, many of the conversations from the night of the murder readily lent themselves to the interpretation that defendants were responsible for the victim's death. See United States v. Dukagjini, 326 F.3d 45, 62 (2d Cir. 2003) ("Even if [the officer's] testimony interpreting the taped conversations had been excluded entirely, the jurors could have interpreted the recorded conversations as involving narcotics based on the testimony of other witnesses."). Also, testimony from other law enforcement witnesses confirmed that the firearm used in the shooting was found at Mykal's girlfriend's house.

Lastly, defendants' own testimony evidenced their guilt. Mykal admitted that the voices on the calls were his and Malik's, that the firearm used in the murder was found at his home, and that he shot the victim and lied when he said that Malik killed the victim to bolster Malik's reputation. Notably, this evidence confirmed that "splashed" meant killed, and the jury would have received defendants' conversation from the night of the murder with or without Kopp's interpretive testimony. Accordingly, we find the trial court's error harmless.

## VI.

The judgment of the Appellate Division is affirmed as modified.

CHIEF JUSTICE RABNER; JUSTICES ALBIN and PATTERSON; and JUDGE FUENTES (temporarily assigned) join in JUSTICE SOLOMON's opinion. JUSTICE PIERRE-LOUIS did not participate.